HARTZ, Circuit Judge.
Plaintiffs Malik M. Hasan, M.D. and Seeme G. Hasan appeal from the entry of summary judgment against them and the denial of their motion for leave to amend their complaint by the United States District Court for the District of Colorado. Plaintiffs sought to recover under an insurance policy with Defendant AIG Property Casualty Co. for the alleged loss of wine bottles that were not delivered to them by a retailer whom they had paid for the wine. The retailer had declared bankruptcy and its principal had pleaded guilty to conducting a Ponzi scheme. The district court held that Plaintiffs were not entitled to recover because they had not shown any physical loss or damage to the wine they had ordered. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm the entry of summary judgment, although on a different ground. Plaintiffs' loss was not insured because they failed to present adequate evidence that they were the owners of any wine bottles not delivered to them. We also affirm the denial of Plaintiffs' motion for leave to amend their complaint.
*1095 I. BACKGROUND
Plaintiffs are fine-wine purchasers who, from 2000 to 2015, ordered wine from Fox Ortega Enterprises, Inc., d/b/a Premier Cru (Premier Cru), a wine merchant in Berkeley, California. They placed their orders through Premier Cru's president John Fox. Premier Cru sold two types of wine: (1) wine physically located at its Berkeley warehouse and retail store; and (2) wine that Premier Cru did not have in its possession but that it promised to deliver to its customers at some later date (referred to as "pre-arrival wine" or "wine futures").
Premier Cru, however, was not actually ordering or delivering much of the pre-arrival wine that it promised.[1] Although Fox represented to customers that Premier Cru had already contracted with suppliers for the wine, he knew that Premier Cru had not and would not actually obtain much of what it sold. In August 2016, Fox pleaded guilty in federal court to wire fraud arising from this Ponzi scheme.
Fox described the scheme in his plea agreement. According to Fox, he accomplished the scheme in two ways. First, he contracted with suppliers and promised to pay them within 30 days for the wine he purchased while knowing that Premier Cru would not be able to make the payments on time or ever. Second, he falsified purchase orders for the wine-he would create entirely false purchase orders reflecting that he had contracted to buy wine from a supplier when he had not, or he would alter legitimate purchase orders to show a number of bottles beyond what was contracted for. Fox then entered these unordered bottles into Premier Cru's inventory records, making them available for sale on Premier Cru's website and through its salespersons. Fox priced the wine at a below-market value, knowing that Premier Cru would not need to pay for what had not actually been ordered. He admitted to selling $20 million worth of this phantom wine from 2010 to 2015.
Premier Cru's shortage of funds was in large part the result of Fox's embezzlement of funds for personal use. He tried to conceal his fraud from customers who complained about not receiving the wine they had purchased by lying "to these customers, offering various falsified excuses and promises for wine that [he] knew was not going to be delivered." Aplt. App., Vol. II at 304. And to silence persistent complainers he would refund their money or buy replacement wines for them. As the government summarized in its sentencing memorandum, "[Fox] effectively ran a Ponzi scheme through his wine business ...." Aplt. App., Vol. I at 203.
Fox admitted that as a result of this scheme, "thousands of customers purchased pre-arrival wine from Premier Cru based on [his] fraudulent misrepresentations or omissions, and ... [as of January 2016], approximately 4,500 customers had not received the pre-arrival wine for which they had paid." Aplt. App., Vol. II at 305. Fox agreed that he owed over $55 million *1096 in restitution, including $689,176.92 to Plaintiffs.
On January 18, 2016 (the Petition Date), Premier Cru filed for Chapter 7 bankruptcy in the United States Bankruptcy Court for the Northern District of California. Plaintiffs claim that at that time they had purchased from Premier Cru but not yet received 2,448 bottles of wine. Dr. Hasan submitted an unsecured claim in the bankruptcy case to recover $689,176.92, the asserted cost of those bottles.
In April 2016, customers of Premier Cru filed in the bankruptcy case a putative class-action complaint against the bankruptcy trustee. Dr. Hasan initially opted out of the class action and filed an objection to the class because class counsel had allegedly informed him that only 97 bottles of wine at the Premier Cru warehouse belonged to him, whereas he believed that he had at least 303 bottles there. As Dr. Hasan acknowledged, however, some of these bottles might have been associated with more than one customer. Dr. Hasan later withdrew his objection and became a member of the settlement class.
The bankruptcy court approved a stipulation of settlement (the Stipulation) between the bankruptcy trustee and the class of plaintiffs. The Stipulation said that as of the Petition Date, some bottles of wine in the warehouse had been "Allocated" by Premier Cru, meaning that "as of that date, there was a code entry in [Premier Cru's] computer inventory system associating a wine by variety and vintage that was in the Warehouse, with a particular purchaser or particular purchasers." Aplt. App., Vol. I at 155. The Stipulation divided the warehouse wine into six categories: (1) "New Bottles," or those received by Premier Cru within 90 days before the Petition Date; (2) "Purchased Bottles," or those in Premier Cru's warehouse allocated to a specific customer with no competing purchasers; (3) "Oversubscribed Bottles," or bottles allocated to more than one customer; (4) "Segregated Bottles," or bottles that "although not Allocated, had been designated for shipping to a particular customer without any competing purchasers, that were pulled off the shelves and segregated for delivery or pickup as of the Petition Date"; (5) "Segregated Oversubscribed Bottles," or Oversubscribed Bottles pulled off the shelf and segregated for delivery or pickup as of the Petition Date; and (6) "Unassigned Bottles," or warehouse bottles that did not fall into any of the above categories. Aplt. App., Vol. I at 155-56. A notice filed before final approval of the Stipulation stated that an inventory of the Premier Cru warehouse had determined that Premier Cru held 78,792 bottles of wine as of the Petition Date, categorized as follows: (1) 5,919 New Bottles; (2) 45,505 Purchased Bottles; (3) 13,388 Oversubscribed Bottles; (4) 2,674 Segregated Bottles; (5) 1,125 Segregated-Oversubscribed Bottles; and (6) 10,181 Unassigned Bottles.
The Stipulation provided for the sale of these bottles with two exceptions. First, class members holding interests in a "Segregated Bottle," could redeem that bottle upon paying expenses and meeting certain other conditions. Second, any Purchased Bottles, Oversubscribed Bottles, or New Bottles allocated to a customer opting out of the class were to be excluded from the sale. Net proceeds from the sale of the nonexcluded wine bottles were to be deposited into accounts corresponding with the category of wine sold. The funds, with the exception of those from the Unassigned Bottles, were then to be split in proportions designated by the Stipulation between Premier Cru's bankruptcy estate and the customers who had purchased that category of wine from Premier Cru. All proceeds from the sale of Unassigned Bottles were to go to the estate.
*1097 The Stipulation further provided that upon its final approval by the court all class members would surrender to the trustee their rights in the wine:
Subject to entry of the Final Approval Order, the Class, on behalf of all its members, hereby assigns to the Trustee, without representation or warranty, all claims of ownership, beneficial interest and/or other rights to any bottles of wine in the Warehouse, other than as expressly preserved or created by this Stipulation. Without limiting the foregoing, the Class, on behalf of all its members, acknowledges and agrees that Trustee may sell all such bottles (other than Opt-out Bottles) and distribute the proceeds thereof in accordance with the terms of this Stipulation.
Aplt. App., Vol. I at 164. The bankruptcy court gave its final approval to the Stipulation on July 27, 2016.
After approval of the Stipulation the bankruptcy trustee moved for an order authorizing the sale of the wine in Premier Cru's warehouse (with the exceptions outlined in the Stipulation) to a prospective buyer. In support of the motion, the trustee filed an inventory of the 78,792 bottles of wine. The inventory listed the producer, vintage, and quantity of the bottles. It did not, however, indicate whether each bottle was allocated to any customers and, if so, whether it was allocated to more than one customer. The trustee also filed lists of the opt-out bottles and the redeemed bottles that were to be excluded from the sale. Plaintiffs say they ultimately received a mere $4,658 from the trustee.
Plaintiffs seek recovery of their losses under a Private Collections insurance policy obtained from AIG to cover their wine collection and other valuables (the Policy). The Policy insured against "direct physical loss or damage to valuable articles anywhere in the world unless stated otherwise in this policy or an exclusion applies." Aplt. App., Vol. I at 101 (italics added). Valuable articles is defined under the Policy as "the personal property you own or possess for which an amount of coverage is shown on the Declarations Page." Aplt. App., Vol. I at 101 (emphasis added). The Declarations Page provided $2,000,000 of coverage for wine. Plaintiffs claim that in purchasing coverage they relied on AIG's website describing its Private Collections policies, which stated that "new acquisitions are immediately covered at the time of purchase." Aplt. App., Vol. II at 319. They also claim to have relied on a Coverage Highlights Sheet distributed by AIG which stated that coverage extended to "[i]n transit items." Aplt. App., Vol. II at 321. The Policy did not contain coverage for fraud. Rather, Plaintiffs held a separate homeowners' policy with AIG that provided such coverage.[2]
On February 16, 2016, about a month after Premier Cru filed for bankruptcy, Plaintiffs submitted a claim to AIG for $1,707,985-the asserted market value of the 2,448 bottles of wine Plaintiffs had purchased but not received from Premier Cru. AIG denied coverage in a letter dated June 3, 2016, on the ground that Plaintiffs "did not experience a loss of wine because [they] did not 'own or possess' the wine at issue as required by the Policy, and therefore cannot be said to have suffered direct physical loss or damage to wine owned or possessed by [them]." Aplt. App., Vol. I at 131. The letter further explained that "[b]ecause you never possessed or owned the wine ..., you cannot be said to have suffered 'direct physical loss or damage' to wine that you never received or owned.
*1098 Any loss under the facts of your claim would be a loss of money, which is not insured by the Collections Policy." Id . at 135. Although Plaintiffs had submitted in support of their claim some correspondence from Fox promising that their wine would be delivered, AIG found that "the emails provided reflect the same type of complaints made by other customers of Premier Cru as reported by the media - delays, false promises and ultimately no fulfillment of the orders paid for in advance." Id .
Plaintiffs sued in Colorado state court, alleging breach of contract, breach of fiduciary duties, breach of implied contractual duties of good faith and fair dealing, the tort of bad faith, and a violation of C.R.S. § 10-3-1115, which prohibits wrongful denial of insurance coverage. AIG removed the case to federal court under diversity jurisdiction.[3] After discovery, AIG moved for summary judgment on two grounds: (1) Plaintiffs did not own or possess the bottles they claimed were subject to the insurance policy; and (2) even if Plaintiffs could establish ownership, they could not show any "direct physical loss or damage" covered by the Policy. Without resolving the ownership question, the district court granted summary judgment for AIG on the second ground. See District Court Order at 10 ("Because there is no evidence of direct physical loss or damage to property as required under the Policy, the Court need not decide whether Plaintiffs own, possess, or obtained title to any of the wine.").
Plaintiffs moved for leave to amend their complaint to add a tort claim based on AIG's failure to renew Plaintiffs' homeowners' policy, allegedly in retaliation for Plaintiffs filing this lawsuit; but the district court denied the motion.
II. DISCUSSION
A. Grant of Summary Judgment
We review de novo the district court's grant of summary judgment. See Garrison v. Gambro, Inc. , 428 F.3d 933, 935 (10th Cir. 2005). A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). No genuine issue of material fact exists "unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party." Bones v. Honeywell Int'l , Inc. , 366 F.3d 869, 875 (10th Cir. 2004). "Unsubstantiated allegations carry no probative weight in summary judgment proceedings." Id. at 875. Rather, "[t]o defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." Id . Although a party may submit an affidavit or declaration in opposing summary judgment, the content "must be based on personal knowledge and must set forth facts that would be admissible in evidence." Ellis v. J.R.'s Country Stores, Inc. , 779 F.3d 1184, 1201 (10th Cir. 2015) (brackets and internal quotation marks omitted). In particular, "at summary judgment courts should disregard inadmissible hearsay statements contained in affidavits, as those statements could not be presented at trial in any form."
*1099 Argo v. Blue Cross & Blue Shield of Kansas , 452 F.3d 1193, 1199 (10th Cir. 2006) (emphasis omitted). Finally, "we have discretion to affirm [a summary judgment] on any ground adequately supported by the record, so long as the parties have had a fair opportunity to address that ground." Champagne Metals v. Ken-Mac Metals, Inc. , 458 F.3d 1073, 1088 (10th Cir. 2006) (internal quotation marks omitted).
The Policy covered only "physical loss or damage to" "the personal property [Plaintiffs] own or possess ." Aplt. App., Vol. I at 101 (emphasis added). Plaintiffs acknowledged at oral argument that they are not seeking to recover for a loss from a Ponzi scheme in which wine was never bought or was sold to multiple customers, and they concede such a loss would not be covered by the Policy.[4] What they contend is that when they sent money to Fox, he used the money to purchase the specified 2,448 bottles of wine for Plaintiffs and allocated the bottles to them. Upon this supposed purchase of those bottles, Plaintiffs say they owned them. But those bottles have not yet been delivered to Plaintiffs. Thus, according to Plaintiffs, the bottles must have been lost or damaged and are therefore covered by the Policy, which, they say, must reimburse them for the market value of the bottles.
The problem with this argument is the absence of evidence that Fox actually purchased the ordered bottles for Plaintiffs. For many (perhaps all) of Fox's other customers, Fox regularly failed to use the money to purchase the ordered bottles. Some of the money went to his personal expenses. Even money that was used for the business often was used to purchase bottles for prior customers whose orders had not been filled. And sometimes bottles that were purchased were purchased for more than one customer. Fox did not necessarily treat Plaintiffs the same way he treated other customers. But Plaintiffs need to provide evidence that they were indeed treated as they contend.
The "evidence" they provide is inadequate. It consists primarily of a four-page declaration submitted by Dr. Hasan. Plaintiffs rely in part on statements by Fox described in the declaration, but we do not consider those statements. AIG argued in its brief on appeal that the statements are inadmissible hearsay, and Plaintiffs' briefs on appeal offer no response to that argument, which is not obviously incorrect. "When an appellee advances an alternative ground for upholding a ruling by the district judge, and the appellant does not respond in his reply brief ..., he [does not] concede[ ] the correctness of the ruling .... But he waives, as a practical matter anyway, any objections not obvious to the court to specific points urged by the appellee." Hardy v. City Optical Inc., 39 F.3d 765, 771 (7th Cir. 1994) ; see Eaton v. Pacheco , 931 F.3d 1009, 1031 (10th Cir. 2019).
Plaintiffs also assert that Fox had a routine practice of always purchasing for them the bottles that they had paid *1100 him for. That argument relies on Federal Rule of Evidence 406, which states:
Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice. The court may admit this evidence regardless of whether it is corroborated or whether there was an eyewitness.
A habit is "a regular practice of meeting a particular situation with a specific type of conduct, ... [which] may become semiautomatic." Camfield v. City of Oklahoma City , 248 F.3d 1214, 1232 (10th Cir. 2001) (internal quotation marks omitted). Similarly, a routine practice is "conduct that an organization performs frequently and consistently in a specific situation." Charles A. Wright, et al., 23 Fed. Prac. & Proc. Evid. § 5274, at 43 (2d ed.).
To prove this alleged routine practice, Plaintiffs rely on Dr. Hasan's declaration, which states merely that he had always received the bottles he paid for except the 2,448 bottles for which Plaintiffs are seeking relief. Plaintiffs argue that this statement establishes a course of conduct from which one can infer that Fox purchased the 2,448 bottles for them.
There are a host of problems with this argument. To begin with, the declaration does not state when Plaintiffs ordered the 2,448 undelivered bottles. If some of the orders were placed long before Premier Cru filed for bankruptcy, then the underlying theory of Plaintiffs' argument-that before the bankruptcy the bottles Plaintiffs ordered were consistently delivered-fails. This appears to be the case, as the purchase orders submitted by Plaintiffs for the 2,448 undelivered bottles reflect orders placed as early as September 2012-years before the bankruptcy.
Second, even if bottles had always been purchased for Plaintiffs until a short time before the bankruptcy, it does not follow that Fox continued to purchase them once the business became insolvent. What one does as a regular practice when there is sufficient money may well not continue when money is short and employees and utilities need to be paid. Cf. Charles A. Wright, et al., 23 Fed. Prac. & Proc. Evid. § 5276, at 62 (2d ed.) ("Since habits and practices can change over time, specific instances from the remote past may be insufficient. The precise nature of the habit or routine practice, and changes in circumstances that might alter habits and practices, may determine how close in time the specific instances must be to the conduct to be proved.")
Third, Plaintiffs' evidence is at most evidence of Fox's conduct in dealing with Plaintiffs specifically. They offer no evidence that Fox treated other customers that way. Indeed, all the evidence is to the contrary. A party cannot establish a habit or routine practice under Rule 406 if the conduct they rely on relates only to a small subset of customers and differs from conduct with respect to other customers. "To obtain a Rule 406 inference of the routine practice of a business, a plaintiff must show a sufficient number of specific instances of conduct to support that inference." Mobil Exploration and Producing U.S., Inc. v. Cajun Const. Serv., Inc. , 45 F.3d 96, 99 (5th Cir. 1995). "Evidence of the defendant's actions on only a few occasions or only in relation to the plaintiff are not enough; the plaintiff must show regularity over substantially all occasions or with substantially all other parties with whom the defendant has had similar business transactions." Id. at 99-100 (footnote omitted); see United States v. Heard , 709 F.3d 413, 434 (5th Cir. 2013) ("There is no indication of how many clients [the defendant] has had in his career, but establishing that he had always filed payroll taxes *1101 for two of them does not provide an adequate sample for showing habit ...."); Simplex, Inc. v. Diversified Energy Sys. , 847 F.2d 1290, 1294 (7th Cir. 1988) ("[T]he Rule 406 inquiry ... necessitates some comparison of the number of instances in which any such conduct occurs with the number in which no such conduct took place." (internal quotation marks omitted)).
Finally, and perhaps most compelling, Plaintiffs admit that the "deliveries of wine to [them] were frequently and often significantly delayed." Aplt. App., Vol. II at 323. Such delay implies that the bottles were not promptly purchased by Premier Cru. It is fully consistent with Fox's confession that he was conducting a Ponzi scheme in which the orders of earlier customers were often filled only after additional funds were supplied by later customers, and even then only after complaints from the earlier customers. This is not the stuff of proof of a habit or routine practice.
Plaintiffs also argue that some of the bottles identified in the inventory of Premier Cru's warehouse submitted as part of the bankruptcy case matched those they had ordered and not received. They suggest this is evidence that Premier Cru ordered bottles specifically for Plaintiffs (and so were owned by them). But Plaintiffs do not so much as cite to a single example of such a bottle. True, the record contains the inventory submitted by the trustee and sales orders reflecting the same wines that were purchased by Plaintiffs yet not delivered, but they have made no attempt to match up the two, other than a barebones statement in the declaration that "there are wines in the custody and control of the bankruptcy trustee [as reflected in the inventory] that are identical to wines that [Plaintiffs] purchased from Premier Cru but have not received." Aplt. App., Vol. II at 324. We note in particular that there is no indication of when the inventoried bottles were ordered or delivered; it would be strange to have bottles in inventory that were purchased two or three years earlier for Plaintiffs but were not delivered. Moreover, even if Plaintiffs were to identify some overlap between the inventory and their sales orders, the inventory does not reflect that any bottles were allocated to them, despite the trustee's efforts to make such allocations.
Absent evidence that any of the 2,448 ordered bottles of wine were actually purchased by Premier Cru, much less specifically purchased for Plaintiffs, Plaintiffs have failed to carry their burden on an essential element of their insurance claim-that there are unaccounted for bottles of wine that they owned. We uphold the district court's grant of summary judgment.
B. Denial of Motion for Leave to Amend
Plaintiffs argue that the district court erred in denying their motion for leave to amend their complaint, filed after the district court had entered its final pretrial order. We review the denial for abuse of discretion. See Monfore v. Phillips , 778 F.3d 849, 851 (10th Cir. 2015) (reviewing motion to amend final pretrial order for abuse of discretion); Wessel v. City of Albuquerque , 299 F.3d 1186, 1197 (10th Cir. 2002) (reviewing motion to amend complaint for abuse of discretion).
Federal Rule of Civil Procedure 15 instructs that leave to amend a complaint should be freely granted "when justice so requires." Fed. R. Civ. P. 15(a)(2). A court may deny leave, however, on account of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility *1102 of [the] amendment." Foman v. Davis , 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). More importantly, the standard becomes much stricter once a final pretrial order has been entered. Such an order may be modified "only to prevent manifest injustice." Fed. R. Civ. P. 16(e). When an amendment to the complaint would in effect modify the final pretrial order, that higher standard must be satisfied. Cf. Gorsuch, Ltd., B.C. v. Wells Fargo Nat'l Bank Ass'n , 771 F.3d 1230, 1241 (10th Cir. 2014) (affirming denial of motion to amend complaint after deadline in Rule 16(b) scheduling order, and noting that "parties seeking to amend their complaints after a scheduling order deadline" must meet the good-cause standard of Rule 16(b)(4), as opposed to simply satisfying Rule 15 ).
The district court entered its final pretrial order on December 12, 2017. The order stated that the pleadings were deemed to be merged into it. On January 29, 2018, Plaintiffs filed a motion to amend their complaint to add allegations that earlier in January, AIG did not renew their homeowners' policy in retaliation for filing the present lawsuit. The district court denied the motion. On May 15, Plaintiffs filed a renewed motion to amend their complaint to add the same claim. The district court denied the renewed motion, holding that Plaintiffs had not satisfied the manifest-injustice standard.
That denial was not an abuse of discretion. Plaintiffs would hardly suffer the manifest injustice required by Rule 16(e), since, as the district court explained, they are free to bring their new claim in a separate action. And on the other side of the ledger, permitting the amendment would have required reopening discovery and setting a new trial date.
III. CONCLUSION
We AFFIRM the district court's entry of summary judgment for AIG and its denial of Plaintiffs' motion to amend their complaint.

We take the description of Premier Cru's fraud from AIG's proposed undisputed material facts, which substantially relied on statements in Fox's plea agreement in federal court. AIG's motion for summary judgment argued that those statements were admissible hearsay as statements against interest under Fed. R. Evid. 804(b)(3). Plaintiffs' response to the motion did not challenge the admissibility of the statements or offer any contrary evidence, except to assert that the fraudulent scheme did not affect them. See Fed. R. Civ. P. 56(c)(1) (party disputing a fact must provide support for that assertion in the record); Fed. R. Civ. P. 56(e) ("If a party ... fails to properly address another party's assertion of fact as required by Rule 56(c), the court may ... consider the fact undisputed for purposes of the motion.").

Plaintiffs and AIG entered into a settlement with respect to the coverage provided by the homeowners' policy, under which AIG agreed to pay Plaintiffs $62,500 for losses stemming from Fox's fraudulent scheme.

Although the state-court complaint and AIG's notice of removal speak only of Plaintiffs' residence , Plaintiffs clarified at oral argument that they are domiciled in Colorado. See Siloam Springs Hotel, LLC v. Century Surety Co. , 781 F.3d 1233, 1238 (10th Cir. 2015) ("An individual's residence is not equivalent to his domicile and it is domicile that is relevant for determining citizenship [for purposes of diversity jurisdiction]."). There is therefore complete diversity with AIG, which is domiciled in New York and Pennsylvania.

The following exchange occurred during oral argument:
Court: You're not claiming that you can recover under the policy just on the basis of being victims of a Ponzi scheme where the wine wasn't bought that you paid for or that the same bottled wine was sold to several different people, are you? Are you claiming that's a loss, or is it something else that you're seeking recovery for? Because that's not clear to me.
Counsel for Plaintiffs: And I apologize for the ambiguity. What we're saying here is not that if money was given to Premier Cru and Premier Cru put it in its pocket or went and did a world tour or something and never purchased any wine, then clearly that's not covered by the Policy. That's not a loss. That is not what we're saying. But that is clearly what did not happen.
Oral Argument at 11:00-12:00.