**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 7, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

SUNFLOWER CONDOMINIUM
ASSOCIATION, INC., a Colorado
nonprofit corporation,

      Plaintiff Counter Defendant -
      Appellant,

v.

OWNERS INSURANCE COMPANY,

      Defendant Counterclaimant -
      Appellee.

No. 18-1478
(D.C. No. 1:16-CV-02946-WJM-NYW)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **LUCERO**, and **EID**, Circuit Judges.
_____

This is an insurance case first brought in state court but then removed to

federal court under diversity jurisdiction, 28 U.S.C. § 1332. Plaintiff Sunflower

Condominium Association (Sunflower) filed this action against Owners Insurance

Company (Owners) claiming that Owners breached a policy of commercial property

coverage and commercial general liability insurance, and also engaged in common

law and statutory bad faith, by failing to fully cover an incident of hail damage that

_____

[*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

occurred to Sunflower's condominium complex. Owners filed a counterclaim alleging that Sunflower violated the terms of the policy by (a) failing to timely report the hail damage, and (b) submitting a claim and proof of loss that grossly overstated the cost of repairing the hail damage. The district court granted summary judgment in favor of Owners on all of Sunflower's claims. The case then proceeded to trial on Owners' counterclaim, and the jury found in favor of Owners. The district court entered final judgment in favor of Owners.

Sunflower now appeals, arguing that the district court (1) erroneously instructed the jury to impute fraudulent intent to Sunflower through the conduct of its independent contractors, (2) erred in denying Sunflower's Rule 50 motion for judgment as a matter of law (JMOL), (3) erred in concluding that the policy afforded Owners a recoupment remedy, (4) denied Sunflower a fair trial as the result of two erroneous evidentiary rulings, and (5) erred in granting summary judgment in favor of Owners on all of Sunflower's claims. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we reject all of these arguments and affirm the judgment of the district court.

I

*Factual background*

Sunflower is a nonprofit, multi-family homeowners association that is incorporated under the laws of the State of Colorado. Sunflower oversees twenty-three separate multi-family condominium buildings containing over 100 individual housing units, a clubhouse, and six detached garage buildings (collectively the

2

Sunflower Property).  Sunflower has a board of directors comprised of volunteer members.

Client Preference Realty & Management, LLC (Client Preference), acting pursuant to a contract with Sunflower, handled the day-to-day management of the Sunflower Property.  Under the terms of the contract between Sunflower and Client Preference, Sunflower agreed to pay Client Preference a 4% special projects fee for projects at the Sunflower Property that cost over $300,000.00.

In 2011, Client Preference assigned employee Denyse Countryman to be the property manager for the Sunflower Property.  Countryman did not maintain an office on-site at the Sunflower Property, but instead visited the Sunflower Property approximately three times per month.  Countryman regularly conducted property inspections, but primarily looked for covenant violations during those inspections.

In 2013, Sunflower purchased from Owners an insurance policy (the Policy) providing commercial property coverage and commercial general liability coverage. The term of the Policy extended from November 12, 2013, to November 12, 2014. Owners, prior to issuing the policy, inspected the Sunflower Property to determine its condition and verify that it was appropriate to insure.

On September 29, 2014, a severe wind and hailstorm damaged portions of the common areas of the Sunflower Property.  In particular, the storm resulted in hail damage to roofs, gutters, and screens on the condominium and garage structures.[1]

---

[1] According to the record, the Sunflower Property was previously damaged by hail storms in June 2009 and June 2012.

Countryman was not at the Sunflower Property at the time of the storm and allegedly has no recollection of the storm. Further, Countryman was allegedly not contacted after the storm by anyone at Sunflower regarding property damage sustained during the storm.

In April 2015, Countryman hired a roofing contractor, R3NG, Inc. (R3NG), to prepare a proposal to fix a leaking roof on one of the individual housing units at the Sunflower Property. Jason Domecq, the R3NG employee/owner who prepared the proposal, observed what appeared to be hail damage on the roof and made a note to that effect in his written proposal, immediately below his detailed descriptions of the items that needed to be repaired. Domecq stated in his note: "There is evidence of hail impacts on both the flat and steep roofs and it is recommended that your insurance company be contacted immediately. You may have a claim." Restricted App., Vol. 1 at 192. On April 27, 2015, Countryman forwarded R3NG's proposal to every board member via email, with instructions to review and approve the proposal. Every board member responded to Countryman's email and approved the proposal.

On September 24, 2015, Countryman was at the Sunflower Property and observed damage to downspouts and window trims. Countryman contacted Adjusters International Matrix Business Consulting (Matrix) to inspect the Sunflower Property and determine the extent and cause of the damages. On October 7, 2015, Countryman met a Matrix employee, Fred Mahe, at the Sunflower Property for purposes of conducting an inspection. Mahe concluded that there was significant hail damage to the Sunflower Property that needed to be repaired.

4

At a board meeting in late October of 2015, Countryman presented the information she had received from Matrix and received approval from the Board to hire Matrix and proceed with filing a claim with Owners for the hail damage. On November 19, 2015, the Board met and executed a written contract with Matrix. Under the terms of that contract, Matrix was to receive 10% of any amount paid by Owners to Sunflower.

Countryman in turn hired R3NG to help Matrix establish the scope of the damage and the amount of the claim to be submitted to Owners. Countryman agreed, on behalf of Sunflower, to pay R3NG for its work.

Dave Ford, a public adjuster employed by Matrix, worked together with Domecq from R3NG to prepare a proof of loss for the Sunflower Property. Together, Ford and Domecq estimated that the cost of repairing the hail damage to the Sunflower Property was approximately 1.8 million dollars.

On December 20, 2015, Sunflower notified its insurance agent regarding the damages resulting from the storm. Owners, after learning of the damages, responded by hiring an independent adjuster named Gary Stevens. Stevens met Ford at the Sunflower Property and, after examining the Sunflower Property, agreed on the scope of damage that was sustained by the Sunflower Property.

On May 4, 2016, Ford sent Owners a "Sworn Statement In Proof of Loss" that included the estimate that was prepared by Ford and Domecq. Sondra Kalcevic, the board president, signed the statement. The statement alleged that the loss occurred

5

"about the 29th day of September 2014" due to "Wind and Hail." ECF No. 94, Exh. M at 5.

After receiving Sunflower's statement, Owners hired an engineer and a building consultant to assist in reviewing the statement. The engineer inspected the Sunflower property and found hail damage to several of the roofs. She was allegedly unable, however, to determine when the hail damage occurred. More specifically, she could not differentiate between hail damage from the September 2014 storm and prior hail storms in 2009 and 2012.

Stevens, the independent adjuster hired by Owners, ultimately concluded that the replacement cost value of the damage to the Sunflower Property was $857,233.89, and that the actual cash value was $590,458.91. In August 2016, Owners made a payment of $515,458.10 to Sunflower in an attempt to resolve the claim. This payment represented the actual cash value estimated by Stevens, minus Sunflower's $75,000 deductible. In April 2017, Owners made an additional payment to Sunflower in the amount of $92,000.00.

### Procedural background

On September 28, 2016, Sunflower filed a complaint against Owners in Colorado state district court. The first claim for relief alleged that Owners breached the insurance contract by failing to pay Sunflower for all damages it sustained from the September 29, 2014 storm. The second claim for relief sought a declaratory judgment regarding Sunflower's right to "coverage for the cost of necessary repairs to [the Sunflower Property] less the applicable deductible." Aplt. App., Vol. 1 at 54.

6

On December 2, 2016, Owners removed the case to the United States District Court for the District of Colorado on the basis of diversity of citizenship.

Sunflower amended its complaint three times after removal. The third amended complaint included the original claims for breach of contract and declaratory judgment, and included two new claims: statutory bad faith under Colo. Rev. Stat. §§ 10-3-1115, -1116, and common law insurance bad faith.

Owners, in its answer to the third amended complaint, asserted as a defense that Sunflower's claims were "barred in whole or in part as a result of [Sunflower's] misrepresentations, false statements, and non-cooperation with Owners." ECF No. 66 at 8. This defense relied on provisions of the Policy that precluded coverage in the event that the insured concealed or misrepresented a material fact or otherwise committed fraud (hereinafter Fraud Clauses). The first of those Fraud Clauses stated: "This Coverage Part [i.e., Commercial Property coverage] is void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact . . . ." Aplt. App., Vol. 20 at 5700. A related provision likewise stated, in pertinent part: "We will not pay for any loss or damage in any case of: 1. Concealment or misrepresentation or a material fact; or 2. Fraud committed by you or any other insured ('insured') at any time and relating to coverage under this policy." *Id.* at 5718. Owners alleged that Sunflower violated the Fraud Clauses by misrepresenting the date when it first learned of the hail damage to the Property, and also by misrepresenting the amount needed to repair the damage. Owners also

7

asserted, in pertinent part, a counterclaim against Sunflower for breach of the Fraud Clauses.

The parties filed cross motions for summary judgment. Sunflower moved for partial summary judgment with respect to Owners' concealment, misrepresentation or fraud defense and Owners' counterclaims for fraud and recoupment. Sunflower argued that Owners could not prove that the date Sunflower had alleged it first discovered the hail damage was false, or that Sunflower intended Owners to take any specific action as a result of the date of discovery. Sunflower also argued that Owners could not prove that the R3NG/Ford estimate of damages was a material fact or that Owners was ignorant of its falsity. Owners, for its part, moved for summary judgment with respect to all of Sunflower's claims.

On May 14, 2018, the district court issued a written order addressing both motions for summary judgment. The district court denied Sunflower's motion for summary judgment on Owners' counterclaims in its entirety. In doing so, the district court concluded that, as to the alleged untimely reporting of the insurance claims, Owners' ignorance of the falsity of Sunflower's date of discovery was not an element of Owners' claim that Sunflower violated the Policy's Fraud Clauses. The district court further concluded that the date Sunflower actually discovered the damage was "'reasonably relevant' to [Owners'] investigation, given that it form[ed] the basis of [Owners'] late notice claim," and "that 'reasonable minds could differ' regarding the materiality of the misrepresentations." ECF No. 149 at 10-11. The district court also concluded that, based upon the evidence before it, "a reasonable jury could find that

8

[Sunflower] knowingly and deliberately misrepresented the date of discovery to [Owners], implying that [Sunflower] acted with the intent to deceive." *Id.* at 11.

As for Owners' defense and counterclaim that Sunflower knowingly misrepresented the cost of repairing the damages in its proof of loss, the district court concluded it was immaterial whether, in fact, Owners attached any importance to Sunflower's estimate. Instead, the district court concluded the question was "whether a reasonable insurance company would attach importance to the matter." *Id.* at 12. The district court concluded that "a reasonable jury could find that a reasonable insurance company could attach importance to [Sunflower's] cost of repair estimate." *Id.* The district court rejected as immaterial Sunflower's argument that Owners was long wary of the truthfulness of Sunflower's estimate. And, ultimately, the district court denied Sunflower's motion for summary judgment after concluding that genuine issues of material fact existed that precluded granting summary judgment on this defense/counterclaim.

As for Owners' motion for summary judgment, the district court first concluded that "a reasonably diligent property manager" in Countryman's position "would have read the e-mail [from Domecq regarding the hail damage] at the time it was received," and that, consequently, Sunflower "was on notice of the damage" at the time Countryman "received Domecq's "April 2015 e-mail" and "the prompt notice provision [of the Policy] was [also] triggered." *Id.* at 16. The district court further concluded "that no reasonable jury could find that [Owners] waived its late notice defense." *Id.* at 17. The district court also concluded that Owners "met its

9

burden to show that it was prejudiced by the delayed notice" from Sunflower. *Id.* at 20. The district court thus concluded that "there [wa]s no genuine issue of material fact that [Sunflower] violated the notice-prejudice rule" and that, consequently, Owners was entitled to summary judgment in its favor "with respect to [Sunflower's] breach of contract claims." *Id.* at 21. The district court also concluded that, because Sunflower's breach of contract claims failed, Owners was entitled to summary judgment with respect to Sunflower's bad faith claims as well.

On October 15, 2018, the case proceeded to trial on Owners' counterclaim for breach of the Fraud Clauses. After hearing five days of evidence, the jury found in favor of Owners on its counterclaim.

Final judgment in the case was entered on November 15, 2018. The judgment stated, in pertinent part: "judgment is entered in favor of Defendant-Counterclaimant Owners Insurance Company and against Plaintiff-Counterclaim Defendant Sunflower Condominium Association, Inc., in the principal amount of $608,409.96 with prejudgment interest of $105,352.18, for a total of $713,762.14, with post-judgment interest at the federal statutory rate of 1.52% until paid." ECF No. 237 at 1.

Sunflower filed a timely notice of appeal.

## II

Sunflower raises five issues on appeal. We conclude, as discussed in greater detail below, that all five issues lack merit. Consequently, we affirm the judgment of the district court.

10

*1) Did the district court err in instructing the jury to impute fraudulent intent to Sunflower through the conduct of R3NG and Domecq?*

In its first issue on appeal, Sunflower argues that the district court erred in instructing the jury to impute fraudulent intent to Sunflower through the conduct of R3NG and Domecq, both of whom Sunflower refers to as its independent contractors. Sunflower asserts that "[t]he lynchpin of Owners' counter-claim [wa]s that Sunflower breached the contract's fraud clause by offering what Owners claims was an intentionally inflated estimate." Aplt. Br. at 29. As noted, the Policy's Fraud Clauses stated, in pertinent part, that the commercial property coverage portion of the Policy was "void in any case of fraud by you as it relates to this Coverage Part at any time. It is also void if you or any other insured, at any time, intentionally conceal or misrepresent a material fact . . . ." Aplt. App., Vol. 20 at 5700. Sunflower argues that, because this policy language makes no reference to "agents" of the insured, it is therefore limited to concealments or misrepresentations made directly by Sunflower. Sunflower argues that "Owners' entire counter-claim, however, turned on Owners' argument that Sunflower's _agents_ fraudulently inflated the Ford/R3NG Estimate." Aplt. Br. at 30 (emphasis in original). Sunflower in turn argues that "Owners did not introduce evidence that anyone at Sunflower, its management, or its own employees were aware the independent adjuster or roofers had falsely inflated the estimate." *Id.* "Consequently," Sunflower argues, "Owners insisted upon and received numerous instructions that the jury should impute the intent of any 'agent' appointed to act on behalf of Sunflower to Sunflower." *Id.* "Further," Sunflower argues, "the court

11

expressly instructed the jury to consider Matrix and Ford the legal agents of Sunflower and to impute Ford's state of mind and intent to Sunflower as a matter of law, regardless of whether Sunflower was actually aware the Ford/R[3]NG Estimate was intentionally inflated." *Id.* "Though the court's instructions did not expressly tell the jury to consider R3NG an 'agent' of Sunflower," Sunflower argues "there were several instructions on agency that allowed the jury to impute the knowledge and intent of the third-party roofing contractor to Sunflower as well." *Id.*

In order to properly address Sunflower's arguments regarding the instructions, it is necessary to review the history of the district court proceedings and several related rulings made by the district court. Owners, in its answer to the Sunflower's third amended complaint, asserted, as both an affirmative defense and a counterclaim, that Sunflower violated the Fraud Clauses of the Policy by knowingly misrepresenting the costs of repairing the hail damage. Sunflower filed a written reply to that counterclaim and asserted a number of affirmative defenses, but did not allege that the Fraud Clauses were limited strictly to actions taken by Sunflower and its employees, as opposed to its agents.

When Sunflower moved for summary judgment in October of 2017, it maintained that Owners "ha[d] not paid the full amount of . . . damages" that was owed to Sunflower under the Policy, and it argued that Owners could not "provide evidence" to support its counterclaim "that Sunflower . . . committed fraud against Owners." ECF No. 93 at 1. More specifically, Sunflower argued that Owners could not "prove either that the R3NG/Ford estimate [wa]s a material fact, or that Owners

12

was ignorant of its falsity." *Id.* at 8. Sunflower asserted in support that Owners attached no importance to the R3NG estimate, and it further asserted that "Owners was aware, since before it paid the undisputed payment, that it did not trust the estimate submitted by Sunflower." *Id.* at 9. Nowhere in its summary judgment motion, however, did Sunflower argue that the Policy's Fraud Clauses were limited by their language to actions committed by Sunflower, nor, for that matter, did Sunflower make any other arguments regarding agency (e.g., that R3NG and Domecq were independent contractors and not agents of Sunflower).

Approximately four months later, in early March 2018, the parties met with the magistrate judge to prepare the final pretrial order. Owners asserted in the final pretrial order, as both a defense and a counterclaim, that Sunflower "all but encouraged its authorized agents to commit insurance fraud" by submitting a knowingly inflated proof of loss to Owners. ECF No. 131 at 6. Sunflower, for its part, asserted that Owners did not rely on, and indeed effectively ignored, the proof of loss submitted by R3NG and Matrix on Sunflower's behalf. Nowhere, however, did Sunflower assert that Owners' agency theory was precluded by the language of the Fraud Clauses, nor did Sunflower otherwise assert that there were any pending issues regarding agency.

On September 17, 2018, approximately one month prior to trial, the parties filed three sets of proposed jury instructions. Included among Sunflower's proposed jury instructions was an instruction defining the term "independent contractor" and effectively asking the jury to determine whether R3NG and/or Matrix were

13

independent contractors.   ECF No. 164 at 10.  Nowhere in this proposed instruction was the term "agent" defined or even mentioned.  Likewise, Sunflower's proposed verdict form contained no mention of the word agent.  And, again, Sunflower made no mention of the Policy strictly limiting fraudulent conduct to Sunflower alone.

Owners' set of proposed jury instructions included a number of instructions that addressed agency.  For example, Owners' proposed instruction I described how an agency relationship is created and defined the terms agent and principal.  ECF No. 167 at 14.  There was also a proposed instruction on the apparent authority of an agent, another stating that any misrepresentations or omissions made by an agent are deemed misstatements or omissions of the principal, and, finally, an instruction stating that Matrix, Ford, Client Preference, Countryman, R3NG, Domecq, and every board member were agents of Sunflower.  *Id.* at 15–16.  Although the caption of Owners' proposed instructions stated they were "DISPUTED," Owners did not identify Sunflower's precise objection to the instructions, nor did Sunflower file a written objection to Owners' proposed instructions.

Lastly, Owners filed what it described as a set of proposed stipulated jury instructions.  One of those instructions stated that "[a]n agent is acting within the scope of its authority when the agent is carrying on business for its principal which the principal has expressly authorized or which is within the incidental, implied, or apparent authority of the agent."  ECF No. 166 at 4.  Others discussed incidental and implied authority of an agent.  *Id.* at 5.  The final stipulated proposed instruction stated that "[a] principal is considered to know or have notice of information if the

14

principal's agent, while acting within the scope of the agent's authority, learns or receives notice of the information." *Id.* at 7.

The case proceeded to trial on October 15, 2018. At the close of Owners' case-in-chief, Sunflower moved for JMOL, arguing that (a) policyholders may legally present inaccurate proofs of loss without conscious dishonesty or intent to defraud, and (b) that Owners' evidence failed to establish that Sunflower submitted a knowingly inflated proof of loss. With respect to this latter argument, Sunflower asserted that Owners presented the testimony of its independent adjuster Gary Stevens, and that Stevens never talked to Ford or Domecq, the two people who prepared Sunflower's proof of loss. Again, however, Sunflower made no mention of any issues regarding agency. The district court took Sunflower's motion for JMOL under advisement.

Sunflower presented the testimony of three witnesses in defense of Owners' counterclaim: Countryman, Edward Fronapfel, an engineer who was hired by Sunflower during the litigation to assess the property and determine if the damages were caused by the September 29, 2014 hail storm, and Domecq. Countryman conceded on cross-examination that Matrix was speaking for Sunflower when it submitted the claim for damages to Owners and that Sunflower could not "pass the buck" by claiming that it did not know of any misrepresentations in the proof of loss. Aplt. App., Vol. 19 at 4999. She also conceded that, under the terms of the contract between Sunflower and Client Preference, Client Preference was to receive a "special projects fee" of 4% of the gross amount of the total cost of repairs to the Sunflower

15

Property, and that she personally would receive 35% of that 4% special projects fee. *Id.* at 5001. Domecq, for his part, had no explanation for numerous categories of damages alleged in the proof of loss and, on several occasions, conceded that certain charges listed in the proof of loss were unjustified. He also contradicted his deposition testimony on multiple occasions. Ultimately, and perhaps most damaging to Sunflower, Domecq conceded that the multiple errors that Owners identified in his proof of loss could reasonably suggest that the errors were intentional rather than random. *Id.* at 5348.

At the close of all the evidence, Sunflower renewed its motion for JMOL and argued, for the first time ever in the proceedings, that the Policy required that any concealment, misrepresentation or fraud have been committed directly by the insured, and not by the insured's agents. Id., Vol. 20 at 5371. Sunflower in turn argued that Owners presented no evidence that "anyone on behalf of Sunflower . . . was involved whatsoever in the conduct which is the . . . inflation of the estimate." *Id.* at 5373. The district court responded: "What you're effectively asking me to rule as a matter of law that the only way" that Owners' "counterclaim goes to the jury is if I rule as a matter of law that the intentional misrepresentation or concealment could only have been done by Sunflower and none of its agents." *Id.* at 5373–74. Sunflower's counsel responded: "Correct." *Id.* at 5374. The district court then stated: "Can I ask you why you've waited to this point to raise this issue?" *Id.* Sunflower's counsel responded: "I don't think it's a matter of waiting as much as a matter of discovering it as we were doing more research, Your Honor." *Id.* Owners' counsel argued, in

16

part, that Sunflower had waived these arguments by failing to raise them at an earlier stage of the proceedings. *Id.* at 5377. The district court noted that Sunflower was "springing this on me at the last moment." *Id.* at 5384. Consequently, the district court took the matter under advisement and directed the parties to file supplemental briefs addressing the issue raised by Sunflower, including whether Sunflower had waived or forfeited the issue that Sunflower could only be liable for concealment, misrepresentation or fraud that it committed.

Owners also moved for JMOL on the issue of whether Matrix, Ford, Client Preference, Countryman, R3NG and Domecq were Sunflower's agents as a matter of law such that their statements in relation to the insurance claim and proof of loss were binding on Sunflower. *Id.* at 5391. The district court concluded, as a matter of law, that Client Preference, Matrix and Ford were agents of Sunflower. *Id.* at 5418-20. But the district court concluded that genuine issues of material fact existed regarding whether R3NG and Domecq were agents of Sunflower. *Id.* at 5421. Thus, the district court granted in part and denied in part Owners' motion for JMOL.

At the end of the fourth day of trial, shortly after the parties made their oral JMOL motions, the district court conducted an instruction conference. During that conference, Sunflower objected to the district court's proposed instructions regarding agency, which included instructions on agency relationship, scope of authority, incidental authority, implied authority, apparent authority, and knowledge imputed to principal. Sunflower argued: "The basis for the objection is that under the explicit terms of the contract [i.e., the Policy], Owners must prove that Sunflower breached

17

the fraud provision, not anything related to one of its agents. What Sunflower's agents did or didn't do are entirely unrelated to this case." *Id.* at 5440. The district court took that objection under advisement.

The next morning, on the fifth and final day of trial, Sunflower filed its brief in support of its renewed motion for JMOL, and also filed objections to the district court's proposed agency instructions. Sunflower argued in its brief that, "[a]ccording to the plain language of the Policy, Owners must prove that Sunflower, rather than its agents, violated the fraud clause," and that "Owners ha[d] failed to present any evidence at trial that Sunflower intentionally misrepresented either the amount of the loss by submitting an inflated claim, or the date of loss." ECF No. 218 at 1. "As a result," Sunflower argued, it "should be granted judgment as a matter of law on Owners' claim for Breach of Contract." *Id.*

The district court denied Sunflower's renewed motion for JMOL and overruled its objections to the proposed agency instructions. In doing so, the district court concluded that "Sunflower's written submission entirely fail[ed] to address the waiver question that the Court and Owners repeatedly raised during oral argument on the motion," and "thus deem[ed] Sunflower to have conceded the issue." ECF No. 231 at 2. The district court also concluded that, in any event, Sunflower forfeited its arguments by failing to raise them "at an appropriate time." *Id.* at 3. Had Sunflower raised its arguments at an earlier stage, the district court noted, it might "have obviated most of the testimony and evidence presented at trial." *Id.* The district court concluded "it would be fundamentally unjust to put Owners to its proof

18

on its counterclaim at a week-long jury trial, and then consider at this late date arguments from Sunflower which, if now accepted by the Court, would render the entire trial a nullity." *Id.* In sum, the district court concluded "that Sunflower forfeited both arguments," i.e., that agency principles did not apply and that recoupment was not a remedy allowed under the Policy, "for failure to timely raise them before trial." *Id.*

Sunflower's opening appellate brief entirely ignores this procedural history and, more significantly, the district court's forfeiture ruling. We have long and consistently held that "[a]n issue or argument [that is] insufficiently raised in the opening brief is deemed waived." *Becker v. Kroll*, 494 F.3d 904, 913 n.6 (10th Cir. 2007); *see Bronson v. Swensen*, 500 F.3d 1099, 1104 (10th Cir. 2007) ("[W]e routinely have declined to consider arguments that are not raised, or are inadequately presented, in an appellant's opening brief."). Adhering to this rule, we conclude that Sunflower has effectively waived any challenge to the district court's forfeiture ruling regarding the agency instructions by failing to acknowledge or challenge that ruling in its opening appellate brief.

*2) Did the district court err in denying Sunflower's Rule 50 motion?*

In its second issue on appeal, Sunflower challenges the district court's denial of its motion for JMOL at the close of all the evidence, arguing that there was no evidence that it intentionally misrepresented or concealed a material fact, aside from erroneously imputing the acts of its independent "agents." Aplt. Br. at 34. According to Sunflower, "the only reason the many instructions on 'agency' were

19

included in the charge was because there was otherwise nothing showing *Sunflower* itself 'intentionally' misrepresented the amount of the loss." *Id.* (emphasis in original). "Thus," Sunflower argues, "this case presents the secondary problem that the *only* evidentiary basis the jury could have relied on for finding a breach of contract by Sunflower was the intent of persons or entities other than Sunflower, which . . . is not supported by the contractual language as a matter of law." *Id.* at 34-35 (emphasis in original). "Under these circumstances," Sunflower argues, this "Court should reverse and render a take nothing judgment on Owners' counter-claim because there is legally insufficient evidence Sunflower or 'another insured' 'intentionally' violated the fraud clause." *Id.* at 35.

Sunflower's challenge to the district court's denial of its motion for JMOL is, at bottom, essentially the same as Sunflower's challenge to the district court's agency instructions. Specifically, Sunflower is asserting that it was entitled to JMOL because (a) the plain language of the Policy's Fraud Clauses limited the scope of those clauses to actions taken directly by Sunflower and its employees, and does not apply to actions taken by agents working on behalf of Sunflower, such as R3NG and Domecq, and (b) Owners presented no evidence at trial establishing that Sunflower or its employees were responsible for the misrepresentations contained in the proof of loss. As discussed above, however, Sunflower fails in its opening appellate brief to address the district court's conclusion that it forfeited these arguments by failing to raise them in a timely fashion prior to trial. We therefore conclude that, as with its

challenge to the district court's instructions on agency, Sunflower has effectively waived any challenge it may have to the district court's forfeiture ruling.

### 3) Does the Policy provide a recoupment remedy?

In its third issue on appeal, Sunflower argues that the Policy does not provide any recoupment remedy, and thus does not allow Owners to recoup the amounts that it paid to Sunflower. In other words, Sunflower argues that Owners "seeks to insert a remedy into the Policy that it does not provide – return or recoupment of an Undisputed Payment the insurer already made on a claim." Aplt. Br. at 40. Sunflower argues that "[t]his is not just a waiver problem," but also "a basic contract interpretation problem" and "[t]he remedy provided by the District Court is not in the Policy." *Id.* at 41. Sunflower in turn argues that we "must interpret the Policy language as written resolving any ambiguity in favor of the insured under the well-established rules" governing contracts of insurance. *Id.*

Notably, Sunflower makes no attempt to identify what ruling of the district court it is actually challenging. As previously discussed, Sunflower first argued that the Policy does not allow for recoupment when it renewed its motion for JMOL at the close of all the evidence. The district court concluded that Sunflower had forfeited this argument by failing to raise it in a timely fashion prior to trial.

Because Sunflower once again fails to acknowledge, let alone directly challenge, the district court's forfeiture ruling in its opening brief, we conclude that Sunflower has effectively waived any challenge to that ruling. *See Becker*, 494 F.3d

21

at 913 n.6 ("An issue or argument [that is] insufficiently raised in the opening brief is deemed waived.").

> 4) *Did the district court deny Sunflower a fair trial as a result of two evidentiary rulings?*

In its fourth issue on appeal, Sunflower argues that it was denied a fair trial as a result of the district court's decision to (a) admit contractor's invoices and bids that were prepared before the 2014 storm, and (b) exclude evidence of Owners' investigation of Sunflower's claim. We review for abuse of discretion the trial court's evidentiary rulings. *Ryan Dev. Co., L.C. v. Ind. Lumbermens Mut. Ins. Co.*, 711 F.3d 1165, 1170 (10th Cir. 2013).

> a) *Admission of contractor's bids and invoices*

During Owners' case-in-chief, the district court permitted Geoffrey Page, a senior claims adjuster employed by Owners, to testify about the amounts of written bids and invoices that Sunflower received from roofing contractors in 2007. Those bids and invoices, which were prepared approximately seven years prior to the storm that caused the damage claimed by Sunflower in this case, related to various roof repairs at the Sunflower Property. Page also testified that he used Xactimate software[2] to change Sunflower's 2016 estimate of damages resulting from the 2014 storm to reflect 2007 pricing and in turn gave that altered pricing report to Gary

---

[2] According to the record, Xactimate software is commonly used by contractors and insurance adjusters to determine the cost of repairs.

Stevens, the independent adjuster who was hired by Owners to review Sunflower's proof of loss and estimate in this case.

Stevens also testified about the 2007 bids and invoices. Stevens explained that, as part of his investigation in this case, he attempted to determine how much the repairs requested by Sunflower in its proof of loss would have cost in 2007 dollars. Stevens contrasted the amounts requested by Sunflower from Owners, adjusted to reflect 2007 pricing, with the amounts contained in the bids and invoices that Sunflower actually received from contractors in 2007. Stevens testified that he had never before seen such a "massive" difference in prices, i.e., the difference between the amounts that Sunflower actually paid for roof repairs in 2007 and the amounts that Sunflower requested from Owners in 2016. Aplt. App., Vol. 18 at 4813.

Although Sunflower objected to the admission of the 2007 bids and invoices, the district court overruled that objection and admitted them for the limited purpose of serving as "evidence of Sunflower's notice of the amount it was invoiced to replace the roofs in 2007 and Sunflower's willingness to pay such price." ECF No. 225 at 13 (jury instructions). The district court specifically instructed the jury regarding the limited purpose of this evidence. *Id.*

Sunflower argues in its appeal that, contrary to the district court's limiting instruction, the 2007 "invoices/bids were intended to be used—and were exclusively used—as proof of the alleged 'truth' stated in them: that the roofs were less expensive to repair at a previous time in order to have the jury compare them to the Ford/R3NG Estimate." Aplt. Br. at 48. Sunflower in turn argues that "the

23

invoices/bids were completely irrelevant and highly prejudicial." *Id.* at 49. Sunflower asserts that "the invoices/bids lack[ed] any detail about the itemized materials costs, labor costs and other critical elements necessary to make a comparison to the detailed Xactimate estimate they were used to attack." *Id.* "Additionally," Sunflower argues, "they were not related to Storm damage because they predated the [2014] Storm entirely." *Id.* Sunflower also argues that the limiting instruction given to the jury by the district court "failed to cure [the] prejudice" that resulted from the documents' admission. *Id.* at 50. Sunflower asserts that "[o]nce the court allowed Owners to publish the numbers from these bids and invoices to the jury and invited its witnesses and the jury to speculate about their relevance to the cost of repairs for damage from the Storm, that comparison permeated the entire case." *Id.* Thus, Sunflower argues, "the admission of such irrelevant and prejudicial evidence and its extensive use throughout the case demonstrates reversible harm just from the admission of this evidence." *Id.* at 51.

We reject Sunflower's arguments and conclude that the district court acted within its discretion in admitting the 2007 bids and invoices for the limited purpose outlined in its instruction to the jury. In admitting this evidence, the district court noted that Sunflower "failed to explain why [Owners'] proposal to have Gary Stevens explain how to compare the estimates [wa]s improper." ECF No. 204 at 7. The district court also explained that Sunflower was "free to challenge [Stevens'] comparison technique on cross examination," and it therefore agreed with Owners "that [Sunflower's] argument [went] to the weight attributable to the proffered

24

testimony, but d[id] not preclude its admission altogether." *Id.* Notably, Sunflower makes no mention of these rationales in its opening appellate brief.

Even assuming, for purposes of argument, that the district court abused its discretion by admitting the 2007 bids and invoices, it is clear that the admission of this evidence was harmless in light of the evidence presented at trial by both Owners and Sunflower. For its part, Owners presented extensive testimony from Stevens, the independent adjuster it hired to review Sunflower's proof of loss. Stevens testified, independent of the evidence of the 2007 bids and invoices, about multiple categories of items in Sunflower's proof of loss that, based upon his experience and expertise, were inflated and unreasonably excessive. Sunflower, during its case, presented testimony from Jason Domecq of R3NG, one of the two people who prepared and submitted the proof of loss on behalf of Sunflower. As previously discussed, Domecq proved to be a disastrous witness for Sunflower. Domecq offered no explanation for numerous line items contained in the proof of loss. He also, on several occasions, conceded that certain charges listed in the proof of loss were unjustified. And, perhaps most surprisingly, he conceded that the multiple errors that Stevens identified in the proof of loss could reasonably indicate that the errors were intentional rather than random. Thus, the 2007 bids and invoices were but a small part of the evidence supporting Owners' counterclaim for fraud and misrepresentation.

  b) *Exclusion of evidence of Owners' investigation of Sunflower's claim*

Sunflower also asserts that the district court abused its discretion by "exclud[ing] evidence of [three] detailed reports prepared by Stevens for Owners related to the Storm damage, which would have been relevant for the jury to conduct an apples-to-apples comparison." Aplt. Br. at 51. Owners objected to admission of these reports on the grounds that they went "to the claims handling" issues raised by Sunflower "that the [district court] ha[d] already" resolved. Aplt. App., Vol. 18 at 4747. Sunflower argued in response that the reports were relevant for purposes of impeaching Stevens. *Id.* at 4749. The district court sustained Owners' objection "because [the reports] [we]re matters directly [involving] the claims handling," but it informed Sunflower that it "w[ould] allow in a limited form [the reports] to be used as potential impeachment of . . . Stevens" (i.e., without actually admitting the reports). *Id.*

Sunflower cross-examined Page, Owners' senior claims adjuster, about eleven items that Stevens failed to include in his initial estimate of damages. *Id.* at 4750–51. During that cross-examination, Page conceded that Stevens had to prepare a revised estimate to incorporate those eleven items and that the revised estimate was greater than the initial estimate. *Id.* at 4751–52. During Sunflower's cross-examination of Stevens, it did not ask him similar questions, nor did it otherwise attempt to impeach him using any of the three reports that were excluded by the district court. At the conclusion of Sunflower's cross-examination of Stevens, the district court stated on the record: "Because the case law is clear that documents can be used for impeachment purposes that have not been received into evidence, I am not precluding

26

you [Sunflower] from using any of the exhibits you referenced in your offer of proof or any of the exhibits . . . as to which I've sustained objections . . . in an appropriate attempt to impeach a witness provided that the foundation has been laid." *Id.* at 4923–24. Thereafter, Sunflower made an offer of proof to the district court regarding the excluded exhibits. Sunflower stated that its "offer of proof relate[d] to cross-examination of Gary Stevens," and that "[h]ad [it] been allowed, [it] would have introduced evidence of Exhibits 71, 76, and 80," which "were various documents that were prepared by . . . Stevens while he was serving as independent adjuster during the claims process. They were a status report, a reserve report, and then what he's referred to as a closing report." *Id.* at 4930. Sunflower in turn stated that those reports "would have been significant" because "they talk[ed] about, on multiple occasions, the need to meet with [Sunflower's] public adjuster to try and reach a resolution; that the two parties had essentially agreed to the scope of the damage, and that it was just a matter of amount of damage; that the parties should meet and reach an agreement as to the amount." *Id.* at 4930–31. Sunflower also stated that it would have "cross examine[d] [Stevens] on the fact that the information, which [was] in the reports that he prepared, sa[id] nothing about inflated estimate, fraud, or raise[d] any red flags whatsoever, which goes to his credibility as an expert now testifying that clearly looking at an estimate that he had dating back to May of 2016 it shows evidence of clear massive fraud." *Id.* at 4931.

Sunflower argues in its appeal that "[a]llowing the jury to hear the total amount of Stevens' estimate upon which the Undisputed Payment was based, without

27

admitting Stevens' own detailed reports, prohibited the jury from fully comparing and understanding the *reasons* behind the difference in the total values of these estimates." Aplt. Br. at 52 (emphasis in original). Sunflower also argues that the "[a]dmission of those documents would have helped the jury understand how Owners' stories about fraudulent inflation and late notice causing prejudice were not based [on] actual concerns of Owners' [sic] during the claims process, and were fabricated only after suit was filed." *Id.*

We conclude, contrary to Sunflower's assertions, that the district court did not abuse its discretion in excluding the exhibits. To begin with, the district court expressly ruled that Sunflower was free to cross-examine Stevens regarding the exhibits, even though the exhibits would not be admitted. Nevertheless, Sunflower chose not to do so, and it offers no explanation in its opening appellate brief for this failure. Thus, as Owners correctly observes in its appellate response brief, "Sunflower's failure to use the exhibits" to impeach Stevens "is not the district court's error," but rather "Sunflower's" error. Aple. Br. at 42. In any event, Sunflower did cross-examine Page regarding the excluded exhibits and elicited from him that Stevens' initial estimate erroneously omitted eleven different items of damages.

5) *Did the district court err in granting partial summary judgment in favor of Owners on Sunflower's claims for breach of contract and bad faith?*

In its fifth and final issue on appeal, Sunflower argues that the district court erred in granting partial summary judgment in favor of Owners on Sunflower's

claims for breach of contract and bad faith. We review de novo the "district court's summary-judgment ruling, applying the same standard that applied in district court." *Greer v. City of Wichita*, 943 F.3d 1320, 1322 (10th Cir. 2019). We also "have discretion to affirm" the district court's summary judgment ruling "on any ground adequately supported by the record, so long as the parties have had a fair opportunity to address that ground." *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1099 (10th Cir. 2019) (quotations and brackets omitted).

Owners argues in response that the jury's verdict supplies an independent basis for affirming the district court's summary judgment ruling on Sunflower's breach of contract and bad faith claims. Aple. Br. at 45–46. We agree. Because the jury found that Sunflower violated the Policy's Fraud Clauses, that determination effectively voids the Policy. As a result, Owners could not, consistent with that verdict, be found to have either breached the Policy or engaged in bad faith by failing to pay the full amount of damages claimed by Sunflower, since Sunflower's violation and the resulting voidance of the contract preceded any alleged breach by Owners. *See generally Wilson v. Muckala*, 303 F.3d 1207, 1219 (10th Cir. 2002) (concluding "that, even if it was error to grant summary judgment for the board members, any error was harmless" because "[p]laintiffs could not have sustained a cause of action in negligence against these individuals when the alleged perpetrator himself was exonerated of negligence"); *Fraser v. Major League Soccer, LLC*, 284 F.3d 47, 60-61 (1st Cir. 2002) (concluding that the grant of summary judgment on a particular claim was harmless in light of the jury's subsequent verdict).

29

## III

The judgment of the district court is AFFIRMED.  Sunflower's motion to maintain district court documents under seal is GRANTED.

Entered for the Court


Mary Beck Briscoe
Circuit Judge
