FILED
United States Court of Appeals
Tenth Circuit

December 11, 2020

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

ESTEBAN ALFARO-HUITRON;
ELEAZAR GARCIA-MATA; JOSE
ANTONIO GARCIA-MATA; JUAN
GUZMAN; RAUL JASSO-CERDA;
ENRIQUE ROJAS-TORRES; LAZARO
ROJAS-TORRES; TRINIDAD
SANTOYO-GARCIA; PEDRO TAMEZ,

      Plaintiffs - Appellants,

v.

CERVANTES AGRIBUSINESS;
CERVANTES ENTERPRISES, INC.,

      Defendants - Appellees.

No. 19-2091

_____

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 2:15-CV-00210-GJF-JHR)**
_____

Jerome Wesevich, Texas RioGrande Legal Aid, El Paso, Texas (Chris Benoit, Texas
RioGrande Legal Aid, El Paso, Texas, on the briefs) for Plaintiffs-Appellants.

Joseph Cervantes, Las Cruces, New Mexico (L. Helen Bennett, P.C., Albuquerque, New
Mexico on the briefs) for Defendants-Appellees.
_____

Before **TYMKOVICH**, Chief Judge, **EBEL**, and **HARTZ**, Circuit Judges.
_____

**HARTZ**, Circuit Judge.
_____

Plaintiffs–Appellants are United States citizens or lawful permanent residents who work as farm laborers. Defendants–Appellees Cervantes Agribusiness and Cervantes Enterprises, Inc. (collectively, Cervantes) are agricultural businesses owned and managed by members of the Cervantes family in southern New Mexico. Plaintiffs brought claims against Cervantes for breach of contract, civil conspiracy, and violations of the Migrant and Seasonal Agricultural Worker Protection Act (AWPA), 29 U.S.C. §§ 1801–72, based on Cervantes's failure to employ them after a labor contractor, allegedly acting on Cervantes's behalf, recruited them under the H-2A work-visa program of the United States Department of Labor (DOL). The district court granted summary judgment in favor of Cervantes on all claims. Exercising jurisdiction under 28 U.S.C. § 1291, we reverse the district court's ruling on the breach-of-contract and AWPA claims because the evidence taken in the light most favorable to Plaintiffs is sufficient to support a finding that the contractor was acting as Cervantes's agent when it recruited them. But we affirm the summary judgment in favor of Cervantes on the conspiracy claim because of the lack of evidence of an agreement between Cervantes and the contractor to engage in unlawful acts.

I.    BACKGROUND

A.    Dealings Between the Parties

In September 2011 Dino Cervantes, managing vice president of Cervantes Enterprises and general manager of Cervantes Agribusiness, signed a one-page "Agreement of Outsourcing Support" with labor contractor WKI Outsourcing Solutions,

LLC (WKI).  Aplt. App., Vol. 1 at 67.[1]  The Agreement stated that it was "for services as a work force provider.  The work force consists of skilled farm labor workers; U.S. Citizens, legal residents, or foreign workers with temporary working visas (H-2A)."  *Id.*  The Agreement was to be "effective from [November 10, 2011] and ending [March 9, 2012], for the following crops:  Processing & Packing:  Dry Red Chile & Other Spices"; and WKI agreed to "provide 15 farm workers on a daily basis for the length of this agreement."  *Id.*  Also in September, WKI entered into materially identical agreements with representatives of three other farm operators and packing companies in southern New Mexico.

The president of WKI, Jaime Campos, had promoted his company to Cervantes and other agricultural businesses as a legal source of foreign labor through the H-2A work-visa program.  He believed that farmers were suffering from a lack of reliable labor in the United States and that the H-2A visa program could solve that problem by bringing workers into the country from Mexico.  One of the farmers who entered into an agreement with WKI, Ronnie Franzoy, testified at his deposition that he wanted all his labor to come from Mexico partly because he thought Mexican laborers were the most

---

[1]  The Agreement named Cervantes Agribusiness as the contractual party but provided the address of Cervantes Enterprises.  The district court "d[id] not decide whether both Cervantes Defendants are parties to the agreement." *Alfaro-Huitron v. WKI Outsourcing Solutions, LLC*, No. CV 15-210 JCH/JHR, 2018 WL 522312, at *6 n.2 (D.N.M. Jan. 22, 2018).  Instead it "consider[ed] this a fact over which there is a genuine dispute." *Id.* The court thus stated that, for purposes of deciding the motion for summary judgment, it would "view[] the evidence in the light most favorable to the Plaintiffs[] and . . . treat the Agreement as including both Cervantes Defendants." *Id.*  We likewise treat the Agreement as including both Cervantes Defendants. *See Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005) ("We construe the factual record and the reasonable inferences therefrom in the light most favorable to the nonmoving party.").

3

dependable.  Mr. Cervantes was also interested in obtaining foreign workers:  He testified at his deposition that there would be no reason for him to use WKI's services if WKI were not bringing in foreign workers.

The H-2A visa program established by the Immigration and Nationality Act of 1952, as amended by the Immigration Reform and Control Act of 1986, allows domestic employers to hire nonimmigrant foreign workers for agricultural labor on a temporary or seasonal basis.  *See Mendoza v. Perez*, 754 F.3d 1002, 1007 (D.C. Cir. 2014).  To obtain permission to hire workers under the program, an employer must establish that it faces a shortage of qualified United States workers and that the employment of foreign labor will not adversely affect the wages and working conditions of similarly employed United States agricultural workers.  *See* 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1188(a)(1).  The program is administered by the DOL, which has promulgated regulations for that purpose.  *See* 20 C.F.R. § 655.0; *see also Mendoza*, 754 F.3d at 1008 (summarizing various DOL regulations).  As we explained in *Llacua v. Western Range Association*, 930 F.3d 1161, 1169 (10th Cir. 2019), "The H-2A program allows for issuance of visas to foreign workers to fill agricultural positions employers cannot fill through the domestic labor market."  Because the DOL has a "statutory duty to protect American workers," its regulations require employers to "first offer the job to workers in the United States."  *Id.* (citing 20 C.F.R. § 655.121).  "Furthermore, the employer must offer domestic workers 'no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers.'"  *Id.* at 1169–70 (quoting 20 C.F.R. § 655.122(a)).  The DOL requires employers to offer at least the highest of the

4

federal or state minimum wage, the prevailing hourly or piece rate, or the adverse-effect wage rate (AEWR) that the DOL sets on a state-by-state basis. *See* 20 C.F.R. §§ 655.120(a), 655.122(l); *see also id.* § 655.103(b) (defining AEWR). The AEWR is calculated under a formula that is intended to ensure that foreign agricultural workers do not undercut domestic wages or adversely affect working conditions of similarly situated domestic employees. *See N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 759 (4th Cir. 2012).

When a labor contractor such as WKI seeks to bring foreign laborers into the country through the H-2A visa program, it must submit, among other required documents, "[c]opies of the fully-executed work contracts with each fixed-site agricultural business" to which the contractor expects to provide H-2A workers. 20 C.F.R. § 655.132(b)(4). Dino Cervantes testified that he knew when he executed the Agreement that WKI would use the Agreement as part of the H-2A application process and that Cervantes would need to pay the AEWR to H-2A workers.

WKI applied for H-2A certification from the DOL in September 2011. As part of this process Mr. Campos submitted under penalty of perjury an Application for Temporary Employment Certification, *see* 20 C.F.R. § 655.130, which stated, among other things, that to the best of his knowledge: (a) "[a]t this time, there are not sufficient workers who are able, willing, or available at the time and place needed to perform the farm labor and services required by . . . farmers [of certain seasonal crops]," Aplt. App., Vol. 3 at 477; (b) workers would be paid the AEWR wage of $9.71 per hour (more than both New Mexico's minimum hourly wage ($7.50) and the federal minimum hourly

5

wage ($7.25) at the time); and (c) qualified United States workers would have priority in hiring, in compliance with federal regulations on the subject, *see, e.g.*, 20 C.F.R. §§ 655.122(a), 655.135(c), 655.156(a). As attachments to the Application form, WKI submitted a list of the anticipated worksites for the H-2A workers, as required by 20 C.F.R. § 655.132(b)(1), and the one-page Agreements of Outsourcing Support that it entered into with growers such as Cervantes, as required by 20 C.F.R. § 655.132(b)(4). WKI also submitted the required job order (commonly referred to as a "clearance order," *see Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1233 n.5 (11th Cir. 2002)), which contained necessary information on the number of workers required, the anticipated work to be performed, the worksites, and the terms of employment. *See* 20 C.F.R. §§ 655.121, 655.122(c); *see also id.* §§ 653.501(c)(1)(iv), (c)(3)(viii).

On November 4, after WKI had corrected a number of deficiencies in its H-2A application, the DOL accepted WKI's application for processing. Because WKI was required to make employment available to United States workers first, *see Llacua*, 930 F.3d at 1169, it began working with the relevant state workforce agencies, including the Texas Workforce Commission (TWC), to recruit United States workers for the available positions described in the clearance order. On November 11, WKI wrote to the DOL to update the agency on its recruitment efforts and to ask for immediate processing of its application because of "the emergency situation and the upcoming agricultural season." Aplt. App., Vol. 3 at 516. On November 14 the DOL notified WKI that its application had been partially certified.

During the recruitment period numerous United States workers expressed interest

6

in WKI's job listings; a person who had worked for TWC for some 40 years testified that she could not remember ever seeing another H-2A application that resulted in so many referrals of qualified United States workers. WKI hired Plaintiffs, all of whom were "United States workers" under the H-2A regulations. *See* 20 C.F.R. § 655.103(b). Because WKI did not draw up separate written work contracts for each Plaintiff, "the required terms of the [clearance] order and the certified Application for Temporary Employment Certification" became their work contracts. 20 C.F.R. § 655.122(q).

At some point in November 2011, however, Mr. Campos called Cervantes and "talked to somebody on the farm," leaving a message for Dino Cervantes that the other farms were terminating their work agreements and that WKI "wouldn't do anything against him" if he likewise "had to terminate" the Agreement. Aplt. App., Vol. 2 at 392. In the same vein, on November 22 WKI sent an "EMERGENCY REQUEST" to the DOL seeking to postpone the start date by four months, changing the period of employment for which WKI had been approved to employ farmworkers to March 1 through June 30, 2012. In its letter to the DOL, WKI stated that "the agricultural producers that WKI has contracted with . . . have informed WKI that due to severe drought conditions . . . , there is no work to be performed at this time." Aplt. App., Vol. 3 at 522. On December 1 the DOL granted WKI's request to cancel its H-2A application because of contract impossibility.

According to Mr. Franzoy, who had also entered into an agreement with WKI, its assertion to the DOL that the contracts were canceled due to weather conditions was "a bunch of kahooey." Aplt. App., Vol. 2 at 427. "The reason that [Mr. Campos canceled

7

the H-2A application was] because he wasn't able to get the people from Mexico in our agreement." *Id.* Mr. Franzoy still "had chile to pick that year," and he "could have used the help and the labor." *Id.* Presumably, Mr. Campos believed that the farmers with whom he had contracted would not be happy about paying AEWR wage rates for domestic workers.

For the Agreement's effective dates of November 2011 through March 2012, Cervantes met its seasonal labor needs through its longtime labor contractor, Jesus Maldonado, whose workers were paid the state minimum wage for picking chile and other tasks. Neither Cervantes nor WKI provided work to Plaintiffs during the time period for which Plaintiffs were hired under the terms of the H-2A contract.

## B. Court Proceedings

Plaintiffs filed suit in the United States District Court for the Western District of Texas against Mr. Campos, WKI, Cervantes, and other agricultural employers with whom WKI had contracted. The case was later transferred to the District of New Mexico. Plaintiffs alleged four causes of action: breach of their employment contracts, violations of the AWPA under 29 U.S.C. §§ 1811, 1821, and 1822,[2] common-law fraud, and civil conspiracy. They sought declaratory relief and statutory or actual damages for the alleged violations of their AWPA rights; actual, incidental, and consequential damages resulting

---

[2] All nine Plaintiffs claimed that Cervantes violated the AWPA's provisions relating to false information, *see* 29 U.S.C. § 1821(f), and working arrangements, *see* 29 U.S.C. § 1822(c). Six Plaintiffs asserted that Cervantes violated the AWPA's certificate-of-registration requirement. *See* 29 U.S.C. § 1811. And one Plaintiff claimed that Cervantes violated 29 U.S.C. § 1821(a) and (g) by failing to disclose to him various required information in writing and in a language he could understand.

8

from the alleged breach of contract, conspiracy, and fraud; and punitive damages. All defendants except Cervantes have either settled or defaulted, or they were otherwise dismissed.

Cervantes moved for summary judgment on all claims. In January 2018 the district court granted the motion on Plaintiffs' claims for breach of contract, fraud, conspiracy, and AWPA violations under 29 U.S.C. §§ 1811 and 1821; and in September 2018 it granted summary judgment on Plaintiffs' § 1822(c) AWPA claim.

On appeal Plaintiffs argue that the district court erred in granting summary judgment in favor of Defendants on their claims for breach of contract, violation of 29 U.S.C. § 1822(c) in the AWPA, and civil conspiracy. They do not challenge the district court's entry of judgment in favor of Cervantes on their claims for fraud and for violations of 29 U.S.C. §§ 1811 and 1821 in the AWPA.

## II.    ANALYSIS

We review de novo the district court's grant of summary judgment, applying the same legal standards that govern the district court. *See Morden v. XL Specialty Ins.*, 903 F.3d 1145, 1151 (10th Cir. 2018). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way, and it is material if under the substantive law it is essential to the proper disposition of the claim." *Dahl v. Charles F. Dahl, M.D., P.C. Defined Ben. Pension Tr.*, 744 F.3d 623, 628 (10th Cir. 2014) (internal quotation marks omitted). "We construe the factual record and the

reasonable inferences therefrom in the light most favorable to the nonmoving party."

*Mata*, 427 F.3d at 749. But "to defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019) (brackets and internal quotation marks omitted). "[W]e have discretion to affirm a summary judgment on any ground adequately supported by the record, so long as the parties have had a fair opportunity to address that ground." *Id.* at 1099 (brackets and internal quotation marks omitted). "[A] federal district court's state-law determinations are entitled to no deference and are reviewed de novo." *Roberts v. Printup*, 422 F.3d 1211, 1215 (10th Cir. 2005) (brackets and internal quotation marks omitted).

### A. Breach of contract

Plaintiffs allege that Cervantes breached Plaintiffs' employment contracts (that is, the clearance order) because it "fail[ed] to provide any of the promised work" to Plaintiffs during the November 2011 to March 2012 season. Aplt. App., Vol. 1 at 56. Although it was Mr. Campos, not Cervantes, who filed the clearance order with the DOL and had direct contact with Plaintiffs, Plaintiffs argue that Cervantes is nonetheless liable because it authorized WKI to act as its agent in recruiting Plaintiffs and therefore can be held responsible by them for any contractual breach. In response, Cervantes contends that the district court correctly concluded that it lacked sufficient control over WKI to create an agency relationship.

We hold that the district court erred in granting Cervantes summary judgment on this ground. As will be explained in more depth below, the "control" test applied by the

10

district court is the test used to distinguish employees from independent contractors, who may or may not be agents. The distinction is important in tort law because employers may be liable for the conduct of tortfeasors who are their employees when they would not be liable if the tortfeasors were not employees but mere independent contractors. But this is a contract claim, not a tort claim. Cervantes may be liable under a contract entered into by Mr. Campos as its agent even though Mr. Campos was not an employee of Cervantes. And although the agency relationship requires some measure of control by the principal, the requisite control is much less intrusive than the control necessary for an employer-employee relationship. In our view, the evidence presented to the district court could support a determination that Mr. Campos was acting as the agent of Cervantes in entering into contracts with Plaintiffs. Therefore, the summary judgment on the contract claim cannot stand.

We assume, as do the parties, that the agency issue should be resolved under New Mexico law. We observe, however, that there appears to be nothing unique about New Mexico law in this area, so we look to the usual common-law authorities, including treatises and case law. In particular, New Mexico courts have treated the Restatement (Second) of Agency (1958) and, more recently, the Restatement (Third) of Agency (2006), as authoritative on various aspects of agency law. *See, e.g.*, *Korba v. Atl. Circulation, Inc.*, 231 P.3d 118, 120 (N.M. Ct. App. 2010) (adopting the test set forth in the Restatement (Second) § 220 for distinguishing between an employee and an independent contractor); *Maes v. Audubon Indem. Ins. Grp.*, 164 P.3d 934, 939–41 (N.M. 2007) (relying on Restatement (Third) § 1.01). And in any event, as shown below, the

11

Restatements and New Mexico case law are aligned on fundamental agency questions such as the formation of an agency relationship.

## 1. Background agency principles

To resolve this appeal, we need not examine all the intricacies of agency law. We will briefly review some of the fundamental concepts and principles. Then we can focus on the meaning and implications of the principal's authority to control the agent.

We begin with the definition: "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01; *see Hansler v. Bass*, 743 P.2d 1031, 1036 (N.M. Ct. App. 1987) ("An agent is one authorized by another to act on his behalf and under his control."); Restatement (Second) of Agency § 1(1) ("Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.").

An agent is not simply someone who acts to benefit another person. Anyone who provides services or goods is expected to benefit us. Central to the notion of agency is that the agent acts "on behalf of" the principal. The agent is acting in the principal's stead, as the principal's representative. As stated by the Reporter for the Restatement (Third) of Agency, "[A]gency doctrine defines the legal consequences of choosing to act through another person in lieu of oneself." Deborah A. Demott, *A Revised Prospectus for a Third Restatement of Agency*, 31 U.C. Davis L. Rev 1035, 1039 (1998). "It has been

said that a relationship of agency always contemplates three parties—the principal, the agent, and the third party with whom the agent is to deal." Restatement (Third) of Agency § 1.01 cmt. c (internal quotation marks omitted).

The portion of agency law relevant to this appeal is that which governs when the principal is liable to a third party for the actions of its agent. As a general rule, liability turns on whether the agent was acting with actual or apparent authority. Both types of authority depend on the acts of and communications by the principal. Actual authority turns on the reasonable belief of the *agent* based on such acts and communications. "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01. "An agent who has actual authority holds power as a result of a voluntary conferral by the principal and is privileged, in relation to the principal, to exercise that power." *Id.* § 1.01 cmt. c. Apparent authority, in contrast, turns on the reasonable belief of *a third party* based on the principal's acts and communications. "Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Id.* § 2.03.

An agent acting under actual or apparent authority can bind the principal to a contract with a third party. *See id.* § 6.01 ("When an agent acting with actual or apparent authority makes a contract on behalf of a disclosed principal, . . . the principal and the

13

third party are parties to the contract."). The third party need not know the identity of the principal. *See id.* § 6.02 cmt. a (The principal is a party to a contract made by its authorized agent if the other party to the contract "has notice that the agent acts on behalf of a principal but does not have notice of the principal's identity."). And even if the agent does not disclose the existence of a principal, the principal will be a party to a contract made on its behalf by an agent acting with actual authority unless the contract specifically provides otherwise. *See id.* § 6.03. As the Restatement (Third) explains, "If an agent acts with actual authority in making a contract on an undisclosed principal's behalf, the basis for treating the principal as a party to the contract is that the agent acted reasonably on the basis of the principal's manifestation of assent to the agent. The principal's liability on the contract is thus consistent with the agent's reasonable understanding of the principal's wishes." *Id.* § 6.03 cmt. b (citations omitted); *see also San Juan Agr. Water Users Ass'n v. KNME-TV*, 257 P.3d 884, 889 (N.M. 2011) ("An undisclosed principal can sue and be sued on a contract made in the agent's name because the common law of agency regards the agent's actions as the principal's own," as the agent's actions are "[u]nquestionably . . . in legal contemplation the acts of the principal" so long as they are within the agent's authority. (internal quotation marks omitted)).

The law governing the principal's liability for tort is a bit different, although there is overlap. As with liability on a contract, a principal is liable for tortious conduct of an agent when the conduct was within the scope of the agent's actual authority. *See* Restatement (Third) of Agency § 7.04(1). Thus, when an agent engages in tortious

14

conduct that "the agent reasonably believes, on the basis of a manifestation of the principal," is in accordance with the principal's wishes, this conduct falls within the agent's actual authority and exposes the principal to liability in tort. *Id.* § 7.04 cmt. b.

But even when the agent's tortious act was not within the scope of the agent's actual authority, the principal may be liable under the doctrine of respondeat superior if the principal is the employer of the agent-employee and the tortious conduct was committed by the employee acting within the scope of employment. *Id.* § 7.07(1).[3] For this purpose, we define *employee* as "an agent whose principal controls or has the right to control the manner and means of the agent's performance of work." *Id.* § 7.07(3)(a). (In the past an employee has also been referred to as a servant, and the principal has then been referred to as the master rather than the employer. *See* Restatement (Second) of Agency § 2 & cmt. a).

What is very important, but often overlooked, is that not every agent is an employee. An agent who is not an employee is called an independent contractor, although some independent contractors (perhaps most) are not even agents. *See* Restatement (Third) of Agency § 1.01 cmt. c ("[T]he common term 'independent contractor' is equivocal in meaning and confusing in usage because some termed independent contractors are agents while others are nonagent service providers."); Restatement (Second) of Agency §§ 2 & cmt. a, 14N & cmt. a (distinguishing between

_____

[3] A principal may incur liability arising from its agent's tortious conduct on other grounds as well, such as for "negligence in selecting, training, retaining, supervising, or otherwise controlling the agent." Restatement (Third) of Agency § 7.05(1).

15

independent contractors and servants); *Korba*, 231 P.3d at 120 (distinguishing between "employer-employee" and "independent-contractor" agency relationships).

The nature and extent of the principal's right to control the agent determines whether the agent is an employee or merely an independent contractor. To be sure, all agents are subject to the control of the principal; control is an essential element of the relationship. *See* Restatement (Third) of Agency § 1.01 cmt. f(1) ("An essential element of agency is the principal's right to control the agent's actions."); Restatement (Second) of Agency § 1 cmt. b ("Agency is a legal concept which depends upon the existence of required factual elements: the manifestation by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking."); *N.M. Military Inst. v. NMMI Alumni Assoc.*, 458 P.3d 434, 440 (N.M. Ct. App. 2018) ("In determining whether an agency relationship exists, the 'principal consideration' is 'the control, or right to control,' the agent's conduct." (quoting *Shaver v. Bell*, 397 P.2d 723, 727 (N.M. 1964))). The control that the principal may exercise over the agent is one of the fundamental attributes of the agency relationship that distinguishes it from other fiduciary relationships, such as that between a trustee and a trust beneficiary. *See* Warren Seavey, *The Rationale of Agency*, 29 Yale L.J. 859, 868 n.29 (1919–20) (acknowledgment by Prof. Seavey that his use of the term *control* in the agency context "may be analytically improper as not falling within recognized categories," but explaining that he uses the term "to indicate the legal coercion capable of being exercised by the principal through his power of revoking, diminishing, or enlarging the powers granted the agent, the agent

16

being under the correlative legal liability of having this power exercised, which distinguishes the relation of agency from that of trustee and *cestui* and of contractors"); Demott, *A Revised Prospectus*, *supra*, at 1037–38 (inclusion of the right of control in the definition of agency "excludes trustees and the directors of corporations because, as the law structures the trust and the corporation, the beneficiaries of these relationships do not have a right of control over the fiduciary actor"); Restatement (Third) of Agency § 1.01 cmt. g ("[A] trustee is not an agent of the settlor or beneficiaries unless the terms of the trust subject the trustee to the control of either the settlor or the beneficiaries.").

The right to control need not be exercised for an agency relationship to exist. It is the right of control, and not the actual exercise of control, that is an essential element of an agency relationship. "A principal's failure to exercise the right of control does not eliminate it . . . ." Restatement (Third) of Agency § 1.01 cmt. c. In *Gallegos v. Citizens Insurance Agency* the New Mexico Supreme Court upheld a jury verdict against an insurance company based on its alleged agent's actions, holding that the jury could reasonably find an agency relationship based on evidence that the defendant "allowed [the alleged agent] to solicit insurance business" and "had the power to control his actions," "even though the right of control may not have been exercised." 779 P.2d 99, 106 (N.M. 1989) (internal quotation marks omitted).

The principal's control may concern only the overall mission, not operational details. For instance, the principal may exercise control simply by giving initial instructions to the agent on what actions to take. "If the principal requests another to act on the principal's behalf, indicating that the action should be taken without further

17

communication and the other consents so to act, an agency relationship exists."

Restatement (Third) of Agency § 1.01 cmt. c*; see also id.* § 1.01 cmt. f(1) ("[W]ithin any relationship of agency the principal initially states what the agent shall and shall not do, in specific or general terms."); Restatement (Second) of Agency § 14 cmt. a ("The right of control by the principal may be exercised by prescribing what the agent shall or shall not do before the agent acts, or at the time when he acts, or at both times."); Deborah A. DeMott, *The Fiduciary Character of Agency and the Interpretation of Instructions* at 2 & n.1, in PHILOSOPHICAL FOUNDATIONS OF FIDUCIARY LAW (Andrew S. Gold & Paul B. Miller eds., 2014) ("The principal's fundamental mechanism of control, which may be supplemented by others, is the provision of instructions to the agent, either initially when stating the actions the agent has authority to take on the principal's behalf or thereafter throughout the duration of their relationship.").

To be sure, as already suggested, "the principal retains the capacity throughout the relationship to assess the agent's performance, provide instructions to the agent, and terminate the agency relationship by revoking the agent's authority." Restatement (Third) of Agency § 1.01 cmt. f(1); *see id.* § 1.01 cmt. c ("The requirement that an agent be subject to the principal's control assumes that the principal is capable of providing instructions to the agent and of terminating the agent's authority."); *id.* cmt. f(1) ("The power to give interim instructions distinguishes principals in agency relationships from those who contract to receive services provided by persons who are not agents."); *id.* § 8.09 cmt. c ("Within a relationship of agency, a principal always has power to provide an agent with interim instructions concerning action to be taken on the principal's behalf.

18

The power to give interim instructions is an integral part of a principal's control over an agent and a defining element in a relationship of common-law agency."); Restatement (Second) of Agency § 14 cmt. a ("The principal's right to control is continuous and continues as long as the agency relation exists, even though the principal agreed that he would not exercise it. Thus, the agent is subject to a duty not to act contrary to the principal's directions, although the principal has agreed not to give such directions."); *id.* ("[T]he principal has power to revoke the agent's authority, although this would constitute a breach of his contract with him.").

But the critical point for our purposes is that, as the Restatement (Second) of Agency explains, the principal's "exercise [of control] may be very attenuated and, as where the principal is physically absent, may be ineffective." § 14 cmt. a; *see also United States v. Ackerman*, 831 F.3d 1292, 1301 (10th Cir. 2016) (Gorsuch, J.) ("[A] principal may delegate general authority to his or her agent to act in the ordinary course, without constant supervision or awareness of every discrete act."). New Mexico law is in accord with this approach. The State's courts "ha[ve] not required a particularly invasive level of control to support a finding that a principal-agent relationship exists." *N.M. Military Inst.*, 458 P.3d at 440. They have concluded that "'a person may be an agent although the principal lacks the right to control the full range of the agent's activities, how the agent uses time, or the agent's exercise of professional judgment.'" *Id.* (quoting Restatement (Third) of Agency § 1.01 cmt. c).

This minimal level of control required to establish an agency relationship stands in contrast to the much more significant and intrusive right of control that makes an agent

19

an employee.  Recall how the Restatement (Third) defines *employee* for the purpose of applying respondeat superior: "an agent whose principal controls or has the right to control the manner and means of the agent's performance of work."  § 7.07(3)(a); *see* § 7.07(1) (vicarious liability of employer for torts of employee).  Implicit in this definition is that one can be an agent of a principal even if the principal does not control or have the right to control the "manner and means of the agent's performance of work."  Otherwise, there would be no need for the definition in § 7.07(3)(a), as one could say simply that a principal is responsible for the tortious conduct of an agent committed while acting within the scope of the agency.  In other words, although one requirement of an agency relationship is the principal's control or right of control over the agent, such control need not be control over the manner and means of the agent's performance of work; that higher level of control is necessary only to establish an employee relationship.

The Restatement (Third) does not explore in depth the meaning of "manner and means."  But to determine whether to apply the doctrine of respondeat superior (that is, whether the principal is liable in tort), the New Mexico courts, following the guidance of the Restatement (Second), have frequently distinguished an employee from an independent contractor based on the power to control.  They have said that "[a]n independent contractor is defined as 'a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking.'"  *Talbott v. Roswell Hosp. Corp.*, 118 P.3d 194, 197 (N.M. Ct. App. 2005) (quoting Restatement (Second) of Agency § 2(3)) (emphasis omitted); *see Jaramillo v. Thomas*,

20

409 P.2d 131, 132 (N.M. 1965) ("A right to control the physical details as to the manner and method of performance of the contract usually but not always establishes a master and servant relationship, but control only of the ultimate results to be obtained usually results in an independent contractor relationship."); *cf. Quigley v. Rosenthal*, 327 F.3d 1044, 1064 n.10 (10th Cir. 2003) ("attorneys are independent contractors as well as agents," as they "exercise exclusive control of the manner of performing their legal work, being responsible to the client only for the result" (ellipsis, brackets, and internal quotation marks omitted)). Under the Restatement (Second) the right to control "physical acts" is accorded primary significance. *See* Restatement (Second) of Agency § 14 cmt. a ("The extent of the right to control the physical acts of the agent is an important factor in determining whether or not a master-servant relation between them exists."); § 220 (the determinative factor is often "the extent of control which, by the agreement, the master may exercise over the details of the work"). But it must be recognized that the control of physical acts is not the exclusive consideration. New Mexico has "adopted the approach taken in the Restatement (Second) of Agency § 220, which incorporates many factors into the calculus of employee versus independent contractor." *Celaya v. Hall*, 85 P.3d 239, 243 (N.M. 2004); *see id.* at 244 ("Applying all the factors in the Restatement to Defendant's job, and in light of the totality of the circumstances, we conclude that at the time of the incident Defendant undoubtedly was an employee of the Department. Considered in context, the Department exercised sufficient control over Defendant's

activities in a manner consistent with the status of employee.").[4]  *But cf. Loya v.*

*Gutierrez*, 350 P.3d 1155, 1169 (N.M. 2015) ("When th[e] right to control is . . .

fundamentally a part of the relationship [such as the relationship between the sheriff and

a sworn sheriff's deputy engaged in enforcing the law], we find it unnecessary to analyze

the relationship under the additional factors announced in *Celaya*.").

In short, where an agent does not need to be an employee to create liability for the

principal—as when an agent with actual or apparent authority enters into a contract on

the principal's behalf, *see* Restatement (Third) of Agency § 6.01—a minimal level of

control may suffice.  In particular, there is no requirement that the principal have the right

to control the manner and means of the agent's performance of work.  *See N.M. Military

Inst.*, 458 P.3d at 440; *cf. Barron v. Evangelical Lutheran Good Samaritan Soc.*, 265 P.3d

720, 722, 725–26 (N.M. Ct. App. 2011) (holding, without discussion of the right to

control, that a nursing-home resident created an agency relationship with her

granddaughter when she authorized her granddaughter to complete her admission

paperwork, binding her to an arbitration agreement entered into by the granddaughter).

The Second Circuit has succinctly stated the proposition:  "Control is not a crucial

question where the issue is liability for a contract . . . .  If the agent had authority to enter

---

[4] "Other considerations include:  1) the type of occupation and whether it is usually performed without supervision; 2) the skill required for the occupation; 3) whether the employer supplies the instrumentalities or tools for the person doing the work; 4) the length of time the person is employed; 5) the method of payment, whether by time or job; 6) whether the work is part of the regular business of the employer; 7) whether the parties intended to create an employment relationship; and 8) whether the principal is engaged in business."  *Celaya*, 85 P.3d at 243 (citing Restatement (Second) of Agency § 220(2)(a)–(j)).

into the contract, the principal will be bound." *Commercial Union Insurance Co. v. Alitalia Airlines*, 347 F.3d 448, 462 (2d Cir. 2003); *see Stripling v. Jordan Production*, 234 F.3d 863, 870–71, 871 n.11 (5th Cir. 2000) (similar).

### 2. Application

In concluding that Cervantes did not have the requisite right to control WKI's actions, the district court reasoned that WKI was an independent contractor because Cervantes "direct[ed] only the result to be accomplished, but not the manner in which it must be accomplished." *Alfaro-Huitron*, 2018 WL 522312, at *8 (applying New Mexico UJI 13-404, which defines *independent contractor* for purposes of respondeat superior). But this is the control test for the employer-employee relationship, not the lesser control necessary for an agency relationship. As the previous discussion explains, an independent contractor may be an agent even if it is not an employee, and a principal may be found responsible for an agent-independent contractor's contractual engagements even if it would not be liable for the contractor's torts. In *Quigley* this court affirmed the district court's rejection of a proposed jury instruction that stated: "To determine whether a person is an agent, the most important factor to consider is whether the principal had the right to control the manner of work performed by the agent." 327 F.3d at 1064 (internal quotation marks omitted). We explained:

> Although control is certainly relevant to the existence of an agency relationship, the tendered instruction did not state that principle. Instead, the tendered instruction referred to a principal controlling "the manner of work performed" by the agent, a requirement necessary only if an agent is alleged to be an employee as opposed to an independent contractor.

*Id.* (citation omitted). The same proposition holds here.

23

Applying the correct legal framework, we conclude that there is a genuine dispute of material fact about whether WKI acted as Cervantes's actual or apparent agent in recruiting Plaintiffs. Construing the factual record and the reasonable inferences to be drawn therefrom in the light most favorable to Plaintiffs, *see Mata*, 427 F.3d at 749, we conclude that a jury could find that WKI and Plaintiffs had reasonable beliefs (traceable to manifestations by Cervantes) that Cervantes had authorized WKI to hire farmworkers for Cervantes. The reasonable belief by WKI establishes actual authority. *See* Restatement (Third) of Agency § 2.01. The reasonable belief by Plaintiffs establishes apparent authority. *See id.* § 2.03.

If Cervantes authorized WKI to hire workers for Cervantes through the H-2A program, it exercised all the control necessary to establish an agency relationship. "If the principal requests another to act on the principal's behalf, indicating that the action should be taken without further communication and the other consents so to act, an agency relationship exists." *Id.* § 1.01 cmt. c; Restatement (Second) of Agency § 14 cmt. a ("The right of control by the principal may be exercised by prescribing what the agent shall or shall not do before the agent acts, or at the time when he acts, or at both times."); DeMott, *The Fiduciary Character of Agency*, *supra*, at 2 & n.1 ("The principal's fundamental mechanism of control, which may be supplemented by others, is the provision of instructions to the agent, either initially when stating the actions the agent has authority to take on the principal's behalf or thereafter throughout the duration of their relationship."). "Control is not a crucial question where the issue is liability for a contract . . . . If the agent had authority to enter into the contract, the principal will be

24

bound." *Commercial Union*, 347 F.3d at 462; *see Barron*, 265 P.3d at 725–26 (nursing-home resident created an agency relationship with granddaughter when she authorized granddaughter to complete her admission paperwork).

The Agreement executed by Dino Cervantes set forth the categories of workers ("skilled farm labor workers; U.S. Citizens, legal residents, or foreign workers with temporary working visas (H-2A)") as well as the type of work they would be performing, the number of workers, and the dates on which they would be working. Aplt. App., Vol. 3 at 474. WKI was required to submit the Agreement and other work contracts to the government to show that it had jobs available for the H-2A workers it sought, *see* 20 C.F.R. § 655.132(b)(4), and those contracts would have been meaningless if they did not create binding obligations on both the contractor and the farmer—particularly if they allowed a farmer to reject the contractor's recruitment of domestic workers at the wage rates required by the program. *See N.C. Growers' Ass'n, Inc.*, 702 F.3d at 759 (DOL regulations are designed "to effectuate Congress' intent that domestic agricultural workers (U.S. workers) be given preference over foreign agricultural workers (H-2A workers), and that the employment of H-2A workers would not adversely affect the wages or working conditions of U.S. workers"); *cf. Everglades Harvesting & Hauling, Inc. v. Scalia*, 427 F. Supp. 3d 101, 116 (D.D.C. 2019) (agricultural labor contractors have a reliance interest in DOL approval of H-2A applications because contractors "must sign contracts committing to provide a certain amount of labor in order to apply for H-2A [temporary labor certifications] in the first place" and have thus "b[ound] themselves to provide labor under the H-2A program"). Dino Cervantes testified that he knew WKI was submitting the

Agreement to the DOL as a necessary part of its H-2A application and that H-2A workers would need to be paid the adverse-effect wage rate. A jury could find that it would have been reasonable for Mr. Campos to infer that he was authorized to hire workers for Cervantes, and that it would have been reasonable for those offered jobs by Mr. Campos (namely, Plaintiffs) to believe that WKI had that authority.

Although not essential to the conclusion that WKI was Cervantes's agent, we also note that the record supports the inference that Cervantes had the right to issue interim instructions to WKI: Mr. Campos testified that he would have followed any instructions that an agricultural business gave him regarding where he should recruit labor and that he would have had to replace any workers that a business did not want working on its farm. And Mr. Campos's conversations with the farm operators about the termination of their work agreements—including the message he left for Dino Cervantes on this topic—reflect his understanding that Cervantes and the other agricultural businesses had the power to revoke WKI's authority to recruit workers on their behalf, likewise demonstrating their right of control. *See* Restatement (Third) of Agency § 1.01 cmts. c and f(1); Restatement (Second) of Agency § 14 cmt. a.

Even if the level of control supported by the evidence was not "particularly invasive," *N.M. Military Inst.*, 458 P.3d at 440, it was sufficient under New Mexico law to expose Cervantes to liability for WKI's alleged contractual breach.[5] *Cf. San Juan*, 257

---

[5] This conclusion finds support in other cases that have touched on this issue. For instance, in *Rodriguez v. SGLC, Inc.*, a district court concluded that a labor contractor who hired Mexican workers under the H-2A program for an agricultural business was the business's agent. *See* 2012 WL 5704403, at *14–15 (E.D. Cal. Nov 15, 2012). And

P.3d at 889 ("Unquestionably, insofar as an agent's acts are within [the agent's] authority they are in legal contemplation the acts of the principal."). We accordingly reverse the district court's grant of summary judgment in favor of Cervantes on Plaintiff's breach-of-contract claim and remand this claim for further proceedings.

To conclude this discussion, however, we must add a cautionary note. Although the evidence here supports an inference that WKI acted as the agent of Cervantes in hiring Plaintiffs, that inference is based on the specifics of this case. We have no reason to think that labor contractors or temporary-employment agencies in general are agents of those businesses that use them. The contractor may merely have a pool of workers from whom the employer can select. That arrangement is readily distinguishable from one in which the employer authorizes the contractor to act on behalf of the employer in hiring the employer's employees.

## B.    The AWPA

Plaintiffs allege that Cervantes violated the AWPA's requirement that "[n]o farm labor contractor, agricultural employer, or agricultural association shall, without justification, violate the terms of any working arrangement made by that contractor, employer, or association with any migrant agricultural worker."  29 U.S.C. § 1822(c).

The AWPA defines *agricultural employer* as "any person who owns or operates a

---

other courts have held that a labor contractor was the agent of an agricultural business in hiring domestic migrant workers.  *See Ochoa v. JB Martin & Sons*, 287 F.3d 1182, 1189–92 (9th Cir. 2002) (Arizona district court had personal jurisdiction over agricultural business because labor contractor was acting as its agent in Arizona); *Castillo v. Case Farms of Ohio, Inc.*, 96 F. Supp. 2d 578, 593–95 (W.D. Tex. 1999); *Cardenas v. Benter Farms*, 2000 WL 1372848, at *8–9 (S.D. Ind. Sept. 19, 2000).

27

farm, ranch, processing establishment, cannery, gin, packing shed or nursery, or who produces or conditions seed, and who either recruits, solicits, hires, employs, furnishes, or transports any migrant or seasonal agricultural worker." 29 U.S.C. § 1802(2). The term *employs* in this statute adopts the definition in the Fair Labor Standards Act (FLSA), *see id.* § 1802(5) (citing *id.* § 203(g)), which states that *employ* "includes to suffer or permit to work," *id.* § 203(g). "An entity suffers or permits an individual to work if, as a matter of economic reality, the individual is dependent on the entity." *Gonzalez-Sanchez v. Int'l Paper Co.*, 346 F.3d 1017, 1020 (11th Cir. 2003) (internal quotation marks omitted).

The regulations implementing the AWPA state that the term *employ* "includes the joint employment principles applicable under the [FLSA]." 29 C.F.R. § 500.20(h)(5). Under these principles, "[t]he term joint employment means a condition in which a single individual stands in the relation of an employee to two or more persons at the same time. A determination of whether the employment is to be considered joint employment depends upon all the facts in the particular case." *Id.*

Plaintiffs contend that Cervantes is liable under the AWPA because Cervantes failed to provide them with work, in violation of the working arrangement created when Plaintiffs accepted WKI's offer of employment under its clearance order. Cervantes does not dispute the district court's conclusion that both Cervantes Agribusiness and Cervantes Enterprises are agricultural employers but argues that they cannot be held liable because neither directly entered into a working arrangement with Plaintiffs or acted as their joint employer.

In the district-court proceedings Plaintiffs argued various theories under which

28

Cervantes could be found liable under the AWPA, including that (1) "Mr. Campos's and WKI's alleged maltreatment of Plaintiffs occurred in an agency capacity attributable to the Cervantes Defendants" and (2) "the Cervantes Defendants and WKI 'jointly employed' the Plaintiffs, thereby making them responsible for WKI's alleged violations of the Act." *Alfaro-Huitron*, 2018 WL 522312, at *11. The district court rejected Plaintiffs' agency theory of AWPA liability for the same reasons discussed (and reversed) above. And it also rejected Plaintiffs' joint-employment theory.

The parties' briefing focuses on the district court's rejection of Plaintiffs' joint-employment theory of liability. But we conclude that the district court erred as an initial matter by rejecting Plaintiffs' agency theory of liability, and we thus reverse on this basis. Agency is a "threshold issue" for determining whether an agricultural business may be held liable under the AWPA for a labor contractor's actions. *Renteria-Marin v. Ag-Mart Produce, Inc.*, 537 F.3d 1321, 1323, 1325–26 (11th Cir. 2008) (labor contractors, or "crew leaders," acted as agents of an agricultural business in obtaining housing for workers and thereby exposed the business to liability for the workers' claims based on the AWPA's housing-related provisions). As one court has explained:

> The fact that Congress has created a statutory framework of protections for migrant workers in no way exempts agricultural employers, recruiters, and overseers from common law agency principles. Rather, the protections afforded by the AWPA are designed to supplement traditional common law principles. Thus, one theory under which the plaintiffs could prove that [the agricultural business] itself committed the alleged violations would be to demonstrate that the [labor contractor's] misdeeds were committed by [the contractor] within the scope of its role as an agent of [the agricultural employer].

*Castillo v. Case Farms of Ohio, Inc.*, 96 F. Supp. 2d 578, 593 (W.D. Tex. 1999) (citations

29

omitted); *see also id.* at 595 ("[The labor contractor's] interactions with the . . . plaintiffs may be attributed to [the agricultural employer] for the purpose of assessing compliance with AWPA."). By not honoring the contract entered into by its agent, WKI, with Plaintiffs, Cervantes would have "violate[d] the terms of a[] working arrangement made . . . with . . . migrant agricultural worker[s]." 29 U.S.C. § 1822(c).[6]

On the other hand, we agree with the district court that absent an agency relationship with WKI, Cervantes was not liable as a joint employer for not hiring Plaintiffs. To be a joint employer, a farmer must, of course, be an employer. "In determining if the farm labor contractor or worker is an employee or an independent contractor, the ultimate question is the economic reality of the relationship—whether there is economic dependence upon the agricultural employer/association or farm labor contractor, as appropriate." 29 C.F.R. § 500.20(h)(4). The DOL has promulgated a regulation setting forth seven factors that are to be considered in determining whether a person is a joint employer: (1) "[w]hether the agricultural employer/association has the

---

[6] We should note that the agency analysis for this federal statutory claim, unlike the breach-of-contract-claim, appears to be governed by federal law, not New Mexico law. *See Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740–41 (1989) (when agency principles are applied to federal statutes, courts should "rel[y] on the general common law of agency, rather than on the law of any particular State"). But because New Mexico follows the same "general common law of agency," *id.*, that applies to this federal claim, the above discussion of agency principles—particularly as it refers to the Restatements— applies with equal force here. *See Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 939 n.3 (9th Cir. 2017) ("The federal common law of agency has frequently been derived from the Restatement[s] of Agency."); *Castillo*, 96 F. Supp. 2d at 594 (referring to Restatement (Second) in considering whether farm was liable under the AWPA based on actions of its agent). Thus, the same facts that could support a finding that WKI was Cervantes's agent for purposes of the breach-of-contract claim would also support a finding that WKI was Cervantes's agent for purposes of this federal claim.

30

power, either alone or through control of the farm labor contractor to direct, control, or supervise the worker(s) or the work performed"; (2) "[w]hether the agricultural employer/association has the power, either alone or in addition to another employer, directly or indirectly, to hire or fire, modify the employment conditions, or determine the pay rates or the methods of wage payment for the worker(s)"; (3) "[t]he degree of permanency and duration of the relationship of the parties, in the context of the agricultural activity at issue"; (4) "[t]he extent to which the services rendered by the worker(s) are repetitive, rote tasks requiring skills which are acquired with relatively little training"; (5) "[w]hether the activities performed by the worker(s) are an integral part of the overall business operation of the agricultural employer/association"; (6) "[w]hether the work is performed on the agricultural employer/association's premises"; and (7) "[w]hether the agricultural employer/association undertakes responsibilities in relation to the worker(s) which are commonly performed by employers, such as preparing and/or making payroll records, preparing and/or issuing pay checks, paying FICA taxes, providing workers' compensation insurance, providing field sanitation facilities, housing or transportation, or providing tools and equipment or materials required for the job (taking into account the amount of the investment)." *Id.* § 500.20(h)(5)(iv). Here, Plaintiffs contend that they were employees of both WKI and Cervantes, who were their joint employers. They argue that regardless of whether there was an agency relationship between WKI and Cervantes, this joint-employment relationship makes Cervantes liable for their not being hired. We are not persuaded.

Plaintiffs' analysis of the joint-employer factors focuses on how Cervantes

ordinarily treats workers who are provided by labor contractors. But such treatment is irrelevant for those like Plaintiffs who are never employed by Cervantes. The "ultimate question" that the seven joint-employment factors are intended to help answer—"whether there is economic dependence upon the agricultural employer/association or farm labor contractor," 29 C.F.R. § 500.20(h)(4)—surely could not be answered by concluding that a contractor's workers were economically dependent on a farmer who had no existing relationship with either the contractor or the workers. Perhaps Cervantes should be treated as a joint employer of agricultural workers who work for a labor contractor on its farm. We need not address that issue, however, to resolve this case. If there was no agency relationship between Cervantes and WKI, we must treat Plaintiffs as if they were employed by a labor contractor who worked on "speculation"—that is, a contractor with no prior relationship to a farmer who hires workers and then approaches the farmer to see if it needs any help. *See Avila v. A. Sam & Sons*, 856 F. Supp. 763, 768 (W.D.N.Y. 1994) (labor contractor who had been repeatedly rebuffed "showed up at the farm" and was employed on a limited basis).

It would make no sense to hold the farmer responsible for promises made to the workers by the broker before the broker and the farmer had any communication, much less a contract, between them. The decision in *Reyes v. Remington Hybrid Seed Co., Inc.*, 495 F.3d 403, 405 (7th Cir. 2007), is instructive. The appellate court held that the farm was the workers' joint employer "for events that occurred in the fields under its management or in its offices." *Id.* at 409. But it was not responsible for the contractor's unauthorized promise to the workers before arrival at the farm that they would be

32

employed for 70 hours per week for six to eight weeks. *See id.* at 405–06. The argument for liability based on the promise, the court explained, "can't rest on [the definition of *employ* in] § 203(g) unless it creates liability that runs backward in time, and there is no reason to read it in that fashion." *Id.* at 405; *see also Avila*, 856 F. Supp. at 770–71 (When a farmer used a work crew brought by a labor contractor who "arrived unsolicited" at the farm, the farmer could be held liable for violating the AWPA's housing provisions but was not liable for any violations stemming from the contractor's recruitment of the work crew.).

We reverse and remand the district court's entry of summary judgment in favor of Cervantes on Plaintiffs' claim under 29 U.S.C. § 1822(c) of the AWPA, but solely on the agency theory of liability.

### C. Civil conspiracy

Under New Mexico law a civil conspiracy is "a combination by two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Las Luminarias of the N.M. Council of the Blind v. Isengard*, 587 P.2d 444, 447 (N.M. Ct. App. 1978). A plaintiff bringing a civil-conspiracy claim must establish (1) the existence of the conspiracy; (2) a specific wrongful act or acts carried out pursuant to the conspiracy; and (3) the damages resulting from such act or acts. *See id.* "Without an actionable civil case against one of the conspirators, . . . an agreement, no matter how conspiratorial in nature, is not a separate, actionable offense." *Ettenson v. Burke*, 17 P.3d 440, 445 (N.M. Ct. App. 2001). "Thus, a conspiracy claim fails as a matter of law when no actionable civil case exists against" a conspirator. *Vigil v. Pub. Serv. Co.*

*of N.M.*, 94 P.3d 813, 817 (N.M. Ct. App. 2004).

The district court held that Plaintiffs' conspiracy claim failed because Plaintiffs had not shown that Cervantes committed an unlawful act. But a wrongful act by any conspirator can suffice. *See Ettenson*, 17 P.3d at 445. The district court failed to consider Plaintiffs' argument that they could rely on Mr. Campos's wrongful acts alone.

Nevertheless, we can affirm the dismissal of the conspiracy claim on another ground, one fully argued in district court and pressed on appeal by Cervantes. *See Hasan*, 935 F.3d at 1099 ("[W]e have discretion to affirm a summary judgment on any ground adequately supported by the record, so long as the parties have had a fair opportunity to address that ground." (brackets and internal quotation marks omitted)). That ground is the failure to show the requisite agreement—the first element of a conspiracy claim.

Plaintiffs must prove "a common design or a mutually implied understanding; an agreement." *Morris v. Dodge Country, Inc.*, 513 P.2d 1273, 1274 (N.M. Ct. App. 1973). A conspiracy's existence will seldom be obvious; generally, evidence of the necessary agreement between coconspirators will be circumstantial and is a matter of inference from the facts and circumstances. *See Santa Fe Techs., Inc. v. Argus Networks, Inc.*, 42 P.3d 1221, 1236 (N.M. Ct. App. 2001). Mere speculation, however, will not do. *See Pedroza v. Lomas Auto Mall, Inc.*, 600 F. Supp. 2d 1162, 1170 (D.N.M. 2009) (evaluating a civil-conspiracy claim under New Mexico law and stating that "evidence of a conspiracy will rarely be obvious. Instead, evidence of a conspiracy will generally be circumstantial. What is important is that the evidence is not speculative."); *cf.* Restatement (Third) of Torts: Liab. for Econ. Harm § 27 cmt. c (2019) ("[A] finding of

34

conspiracy [cannot] be based just on suspicion," although it must usually be proved "by circumstantial evidence, such as meetings, shared motivations, and suggestive words. . . . But whether it be proven by direct evidence or otherwise, and whether it be explicit or tacit, an agreement must be found."). For the following reasons, we believe that Plaintiffs' evidence does not suffice.

Plaintiffs allege that Cervantes conspired with Mr. Campos and WKI to evade the H-2A program's requirements, intending to access foreign workers from Mexico without giving priority to and hiring available United States workers like Plaintiffs as required by law. "Plaintiffs claim that Mr. Campos and the farmers, including Dino Cervantes, wanted Mexican laborers because they believed they would work harder [than United States workers] for less money." *Alfaro-Huitron*, 2018 WL 522312, at *5.

Plaintiffs argued in district court, and continue to argue on appeal, that at least three facts in the record substantiate the existence of this alleged conspiracy: (1) Cervantes apparently had no legitimate business reason to join WKI's H-2A application (as it admitted in deposition testimony that it always had access to all the United States labor it needed), and the only rational reason for it to contract with WKI was to circumvent federal law and obtain immediate access to Mexican labor; (2) WKI's explanation for why it had to cancel the H-2A application was false, and the true reason for the cancellation was that WKI was unable to obtain Mexican labor as promised; and (3) after WKI cancelled the H-2A application, Mr. Cervantes used his longtime labor contractor to hire all the workers that Cervantes needed at minimum wage, which is further proof that Cervantes had no

35

economic incentive or intention to hire and pay United States workers under the higher H-2A rates required for WKI's workers.

We are not persuaded. None of the three facts substantiates, either directly or by inference, Plaintiffs' allegation that Cervantes had a "meeting of the minds" with Mr. Campos to accomplish the illegal objective of importing Mexican laborers without following the federal H-2A requirements. Aplt. App., Vol. 1 at 54. As Cervantes points out, Plaintiffs present "no document or evidence of any unlawful communications of a conspiratorial nature [that] were exchanged between Mr. Campos and Mr. Cervantes." Aplee. Br. at 37. Indeed, there is no evidence of any communication by Cervantes to Mr. Campos after signing the Agreement. True, Cervantes employed WKI with the hope of obtaining laborers from Mexico. But there is no evidence that if WKI failed in that endeavor and Cervantes was required by the federal regulations to hire domestic farmworkers, it planned to renege on its contract, much less that it shared such a plan with Mr. Campos. There is simply nothing in the record on which to impugn Cervantes's integrity. (Yes, Cervantes continues to argue that it is not liable to Plaintiffs. But, particularly in light of the district court's ruling in their favor, there is no reason to believe that the denial of liability has ever been in bad faith.) Only speculation supports the allegation that Cervantes and WKI agreed to evade the H-2A requirements. *See Pedroza*, 600 F. Supp. 2d at 1170; Restatement (Third) of Torts: Liab. for Econ. Harm § 27 cmt. c (2019) ("A conspiracy is not proven by showing a mere relationship or association between the accused parties, nor can a finding of conspiracy be based just on suspicion."); *see also Saylor v. Valles*, 63 P.3d 1152, 1159 (N.M. Ct. App. 2002)

36

("Plaintiffs make conclusory statements of a conspiracy, but there are no facts from which we can directly or inferentially conclude that Defendants agreed to do wrongful acts."); *Abercrombie v. City of Catoosa, Okla.*, 896 F.2d 1228, 1230–31 (10th Cir. 1990) (two threatening statements made to the plaintiff, one by the mayor regarding the plaintiff's testimony in an unrelated case against the city, and the other by the city's police chief regarding the plaintiff's wrecker business, did not, in the absence of any evidence of communications between the two, establish a "meeting of the minds" showing that the mayor and police chief conspired to bar any wrecker referrals from the police to the plaintiff's business). Accordingly, we affirm the entry of summary judgment in favor of Cervantes on the civil-conspiracy claim for lack of sufficient evidence of a conspiracy.

## D. Additional arguments

Plaintiffs briefly argue on appeal that the district court violated Fed. R. Civ. P. 56(a) by granting summary judgment without discussing Cervantes's arguments that it was entitled to summary judgment on the grounds of abandonment and lack of damages. We see no error, since the district court clearly based the summary judgment on other grounds. On remand those grounds can still be pursued by Cervantes. We express no view on their merits.

## III. CONCLUSION

We **REVERSE** the district court's entry of summary judgment in favor of Cervantes on Plaintiffs' claims of breach of contract and violation of 29 U.S.C. § 1822(c)

and **REMAND** for further proceedings on those claims.  The district court's summary-

judgment orders are otherwise **AFFIRMED**.